UNITED STATES of America

v.

GENERAL MOTORS CORPORATION.

Civ. No. H-74-314.

United States District Court,
D. Connecticut.

Oct. 24, 1975.

Henry S. Cohn, Asst. U. S. Atty., Hartford, Conn., for plaintiff.

Ralph Dixon, Robert P. Knickerbocker, Jr., Day, Berry & Howard, Hartford, Conn., for defendant.

RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT AND DEFENDANT'S ALTERNATIVE MOTION TO DISMISS

CLARIE, Chief Judge.

This case has been submitted on cross-motions for summary judgment under Fed.R.Civ.P. 56 and the defendant's alternative motion to dismiss pursuant to Fed.R.Civ.P. 12. The facts have been stipulated, and the Government has filed the Coast Guard's administrative record at the Court's request.[1]

The case involves the United States Coast Guard's assessment of a $1,200 civil penalty against the defendant as a result of an oil spill at its New Departure Hyatt Bearing Division plant in Bristol, Connecticut. The defendant refused to pay the assessment voluntarily, and the United States brought this action to enforce its collection. The Court has jurisdiction by virtue of 28 U.S.C. § 1355, which vests the district courts with original jurisdiction in "any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress."

Title 33 U.S.C. § 1321(b)(6) authorizes the imposition of a civil penalty in appropriate cases; however, the application of the statute requires that each case be examined on its own facts to determine the culpability, if any, and the penalty to be imposed. In the present case, the Court finds from the stipulated facts that the defendant was completely free from material negligence or fault in connection with the acts of vandalism which resulted in the discharge of oil. Since this finding does not support the imposition of more than a nominal penalty, the Court grants the plaintiff's motion for summary judgment and modifies the imposition of the penalty to the nominal sum of one dollar.

*Facts*

The defendant, a Delaware corporation, operates its Hyatt Bearing Division in Bristol, Connecticut. In December 1971 the defendant ceased manufacturing operations at its Northside plant, and prepared to offer it for sale. The fuel oil storage tanks at Northside were drained, except for a reserve needed to keep the plant operable and to protect machinery in extremely cold weather. Thereafter, the defendant's purchasing and engineering personnel visited the site frequently, and security personnel

1. No record was made of the informal hearing conducted by the Coast Guard, so the administrative record consists primarily of correspondence and intra-office memoranda. Included is a one-page report of the administrative hearing, apparently prepared by the hearing officer, which varies somewhat from the version of the facts stipulated in the present action. The Government conceded at oral argument that the defendant is entitled herein to a trial *de novo*.

patrolled the premises. At the time of the incidents on which the Government predicates defendant's liability, these security patrols were being made three times per day, seven days per week. In addition, at the defendant's request the Bristol Police Department had increased its patrols of the plant in response to several thefts there.

In the early afternoon of Wednesday, April 18, 1973, the Bristol Police Department notified the defendant that a heavy oil discharge observed that morning had been traced to the Northside plant. Investigation disclosed that unidentified vandals had managed to reach the plant's oil storage tanks, apparently by scaling two fences. One fence, 12 feet high and topped with barbed wire, surrounded the plant, while another, 10 feet high and topped with barbed wire, enclosed the tanks. The gates of both fences were securely chained and padlocked.

The valves on the storage tanks were not locked,[2] and the vandals opened at least two of them, releasing a quantity of No. 6 fuel oil from the main oil storage tank through an underground pipe into an underground day tank, thereby causing it to overflow onto the ground. The oil thereafter drained into a manhole and proceeded through a storm sewer into North Creek, which flowed into the Pequabuck River.

When the defendant acquired knowledge of the spill, it promptly notified the Connecticut Department of Environmental Protection, the United States Environmental Protection Agency and the United States Coast Guard. Its action complied with 33 U.S.C. § 1321(b)(5), which provides for the imposition of criminal penalties for failure to immediately notify the appropriate federal agency of any such discharge. The defendant dispatched employees to the area of the spill, to initiate containment and clean-up operations, and supplemented these efforts by engaging an outside contractor. These clean-up operations lasted 10 days, at a total cost to the defendant of $16,202.48.

As a result of the spill, between 6,000 and 8,000 gallons of oil collected on the ground surface, and approximately 1,000 gallons of this amount made its way into North Creek. The containment operations kept all but about 50 gallons from escaping downstream from the immediate plant area. It is estimated that only about 25 gallons of this oil ultimately reached the Pequabuck River. Substantially all the spilled oil, including that which reached the creek and river, was eventually removed during the clean-up operations.

Seven months later, the Commander of the Third Coast Guard District notified the defendant that, subject to the latter's right to a hearing, a civil penalty of $2,000 would be assessed for the discharge, pursuant to the provisions of 33 U.S.C. § 1321(b)(6). After an informal hearing in January 1974, at which no transcript was made, the defendant was notified that a penalty of $1,200 had been imposed by order of the Coast Guard District Commander. In assessing the penalty, the Coast Guard relied on the information provided by the defendant when it notified federal authorities of the spill as required by 33 U.S.C. § 1321(b)(5), and the information obtained from the Connecticut Department of Environmental Protection and the Bristol Police Department, after defendant's notification.

In March 1974, the defendant appealed to the Commandant of the Coast Guard requesting a review of the penalty assessment, buttressing its request with substantially the same arguments as made in the present action, namely: (1) that no penalty could be assessed where the discharge resulted solely from

2. At the time of this incident, federal regulations did not require such valves to be locked. In December 1973, regulations were adopted requiring locks on the valves of such storage tanks, as well as the provision of containment pits. 40 C.F.R. § 112.-7(2)(ii), (9)(ii).

the act of a third party; (2) that the requirement that the size of the discharger's business be considered in assessing the penalty violated the defendant's constitutional right to equal protection under the law; (3) that the civil penalty provisions are actually criminal in nature, and accordingly the Coast Guard hearing procedures violated the defendant's right to due process of law; and (4) that the use immunity provision of 33 U.S.C. § 1321(b)(5) prohibits the imposition of such a penalty.

The request for review was denied by Rear Admiral R. A. Ratti, Chief Counsel of the Coast Guard. He based his ruling on the following principles: (1) that the third party responsibility for the discharge was irrelevant to the civil penalty provisions of 33 U.S.C. § 1321(b)(6); (2) that no immunity from such a penalty was conferred by the statute because the defendant had properly reported the discharge; (3) that the defendant's constitutional rights to due process and equal protection were not violated by the civil penalty procedures; and (4) that the amount of the penalty assessed was proper. Payment was ordered by May 22, 1974, which deadline was subsequently extended to June 15, 1974. Said payment not having been timely made by the defendant, the Government brought this action on October 8, 1974, requesting that judgment in the

amount of $1,200 be entered in favor of the Government.

*Applicable Statutes*

The statutory provisions challenged in this litigation are a part of the Federal Water Pollution Control Act (FWPCA), a comprehensive statutory scheme designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (Supp.1973).[3] As part of the overall plan, 33 U.S.C. § 1321 regulates the discharge into navigable waters of oil and other substances harmful to the environment. The declared policy of the Congress in enacting Section 1321 was "that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States . . . ." 33 U.S.C. § 1321(b) (1). The statute employs several devices to accomplish this goal, including the following:

(1) It makes it a crime for the "person in charge" of a vessel or facility to fail to inform the appropriate federal agency immediately of any discharge of oil or a hazardous substance, but provides use immunity from prosecution "in any criminal case" except perjury or giving a false statement. 33 U.S.C. § 1321(b)(5).[4]

---

3. Originally enacted in 1948, the Federal Water Pollution Control Act has been amended often, most significantly in the Federal Water Pollution Control Act Amendments of 1972, Pub.L. 92–500, 86 Stat. 816, which effected substantial amendment, reorganization and expansion of the act's provisions. Since the 1972 amendments, the FWPCA, formerly codified as 33 U.S.C. § 1151 et seq., has been re-designated 33 U.S.C. § 1251 et seq. See notes on "Codification" following 33 U.S.C. § 1151 (1970) and 33 U.S.C. § 1251 (Supp.1973). Since the section numbers sufficiently indicate the pre- and post-1972 codifications, citations herein do not specify the 1973 Supplement to the United States Code unless necessary for clarity.

4. 33 U.S.C. § 1321(b)(5) provides:
"Any person in charge of a vessel or of an onshore facility or an offshore facility shall, as soon as he has knowledge of any discharge of oil or a hazardous substance from such vessel or facility in violation of paragraph (3) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. Any such person who fails to notify immediately such agency of such discharge shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both. Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement."

(2) It authorizes the President to act to remove or arrange for the removal of such oil or hazardous substance unless he determines that the owner of the vessel or facility from which the discharge occurs will remove it properly. 33 U.S.C. § 1321(c)(1).[5]

(3) Subject to specified limits and defenses, including the defense that a third party was the sole cause of the discharge, it makes the owner of a facility from which oil or a hazardous substance is discharged liable to the United States Government for the actual costs incurred in clean-up operations. 33 U.S.C. § 1321(f)(2).[6]

(4) Subject to the same defenses, it makes the owner of a facility from which a hazardous substance determined to be non-removable is discharged liable for a "civil penalty," varying in amount in relation to such factors as toxicity, degradability and dispersal characteristics of the substance and the amount discharged. 33 U.S.C. § 1321(b)(2)(B)(ii)–(iv).[7]

(5) Subject to specified defenses and limits, it makes third parties who were solely responsible for a discharge of oil or a hazardous substance liable to the United States for the actual costs incurred in clean-up operations. 33 U.S.C. § 1321(g) and (h).[8]

5. 33 U.S.C. § 1321(c)(1) provides:

"Whenever any oil or a hazardous substance is discharged, into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, the President is authorized to act to remove or arrange for the removal of such oil or substance at any time, unless he determines such removal will be done properly by the owner or operator of the vessel, onshore facility, or offshore facility from which the discharge occurs."

6. 33 U.S.C. § 1321(f)(2) provides in pertinent part:

"Except where an owner or operator of an onshore facility can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any such facility from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil or substance by the United States Government in an amount not to exceed $8,000,000, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs."

7. The purpose of this civil penalty provision is explained in Senate Report No. 92–414,

1972 U.S.Code Cong. and Admin.News 3732:

". . . The Committee was concerned that many hazardous substances cannot be cleaned up by standard methods because they immediately dissolve in the receiving waters.

"These substances, the discharge of which may cause environmental disaster, could not be subject to any meaningful clean-up liability. A clean-up liability provision therefore would provide no incentive to carriers and handlers of these substances to exercise the great caution that such materials warrant."

8. 33 U.S.C. § 1321(g) provides in pertinent part:

"(g) In any case where an owner or operator of a vessel, or an onshore facility, or of an offshore facility, from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section, proves that such discharge of oil or hazardous substance was caused solely by an act or omission of a third party, or was caused solely by such an act or omission in combination with an act of God, an act of war, or negligence on the part of the United States Government, such third party shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for removal of such oil or substance by the United States Government, except where such third party can prove that such discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of another party without regard to whether such act or omission was or was not negligent, or any combination of the foregoing clauses."

(6) It authorizes the owner of a facility from which oil or a hazardous substance was discharged to bring suit in the Court of Claims and recover from the United States his reasonable costs incurred in clean-up operations upon showing that the discharge was caused solely by the act or omission of a third party or by other specified causes not the owner's fault. 33 U.S.C. § 1321(i).[9] (The defendant in the present case has filed such a suit in the Court of Claims.)

(7) It provides that a "civil penalty" of up to $5,000 shall be assessed against the owner or operator of any vessel or facility from which oil or a hazardous substance is discharged "in harmful quantities" as determined by the President. 33 U.S.C. § 1321(b)(3) and (6).[10]

In determining the amount of the penalty, the administrative agency is required to consider three factors: ". . . the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, *and the gravity of the violation . . . .*" (Emphasis added) 33 U.S.C. § 1321(b)(6). Prior to the 1972 amendments of the FWPCA, the element "knowingly" was a condition precedent to the imposition of this penalty, and its maximum amount was $10,000. 33 U.S.C. § 1161(b)(6). The $1,200 penalty which the Government seeks to recover in the present action was imposed under

9. 33 U.S.C. § 1321(i) provides in pertinent part:

"(i)(1) In any case where an owner or operator of a vessel or an onshore facility or an offshore facility from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section acts to remove such oil or substance in accordance with regulations promulgated pursuant to this section, such owner or operator shall be entitled to recover the reasonable costs incurred in such removal upon establishing, in a suit which may be brought against the United States Government in the United States Court of Claims, that such discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether such act or omission was or was not negligent, or of any combination of the foregoing causes."

10. 33 U.S.C. § 1321(b)(3) provides:

"(3) The discharge of oil or hazardous substances into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone in harmful quantities as determined by the President under paragraph (4) of this subsection, is prohibited, except (A) in the case of such discharges of oil into the waters of the contiguous zone, where permitted under article IV of *the International Convention for the Prevention of Pollution of the Sea by Oil, 1954*, as amended, and (B) where permitted in quantities and at times and locations or under such circumstances or con-

ditions as the President may, by regulation, determine not to be harmful. Any regulations issued under this subsection shall be consistent with maritime safety and with marine and navigation laws and regulations and applicable water quality standards."

33 U.S.C. § 1321(b)(6) provides:

"(6) Any owner or operator of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3) of this subsection shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense. No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearing on such charge. Each violation is a separate offense. Any such civil penalty may be compromised by such Secretary. In determining the amount of the penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered by such Secretary. The Secretary of the Treasury shall withhold at the request of such Secretary the clearance required by section 91 of Title 46 of any vessel the owner or operator of which is subject to the foregoing penalty. Clearance may be granted in such cases upon the filing of a bond or other surety satisfactory to such Secretary."

the "civil penalty" provision of 33 U.S. C. § 1321(b)(6), and the defendant directs its arguments at the purpose and effect of that section.

### The Defense of Third Party Causation

The defendant's first argument is based on statutory construction. It asks the Court to construe § 1321(b)(6), so that the act of a third party which is the sole cause of an oil discharge constitutes a complete defense to the imposition of a civil penalty on the owner or operator of the facility. Although such a rule may appear to be a just and wise public policy, it is not contained in the statute, which is based on a concept of "strict liability," providing that a penalty "shall be assessed" whenever oil is discharged in harmful quantities as established by regulation.

The defendant points to certain portions of the legislative history of the 1972 amendments to the FWPCA, as indicating the intent of Congress that the owner of a facility should not be liable when a discharge is attributable to the actions of third parties. These latter amendments expanded the coverage of § 1321 to include discharges of "hazardous substances" in addition to oil. That portion of the legislative history cited by the defendant concerns those amendments which made a discharger of hazardous substances liable for their clean-up costs under § 1321(f)(2) or for a potentially large monetary penalty in lieu of clean-up costs under § 1321(b)(2)(B)(ii)–(iv) if the substance cannot be cleaned up.

Under the present statute, one who discharges hazardous substances has available the same defenses to the imposition of clean-up costs and the penalty in lieu of clean-up costs as did the discharger of oil under the predecessor statute; these include the defense that the discharge was solely caused by a third party. In pointing this out, the House and Senate reports cited by the defendant do not refer to the less severe civil penalty imposed by § 1321(b)(6). In regard to the intent of that penalty, there is a marked "absence of any clear and persuasive legislative history," *United States v. LeBeouf Bros. Towing Co., Inc.,* 377 F.Supp. 558, 563 (E.D.La. 1974),[11] and certainly none bearing on the defense of third party causation.

Since the defendant has not shown that the statutory construction it advocates is required in order to uphold the statute against constitutional attack, or mandated by a compelling public policy, the Court agrees with the Government's position that the action of a third party is no absolute defense to the imposition of a civil penalty under § 1321(b)(6). It may well be of importance in fixing the amount of the penalty, but on the record in this case the Court cannot legislatively graft a defense expressly embodied in some subsections of § 1321, onto a subsection of the Act from which Congress clearly omitted it.

### Whether the Penalty is "Civil" or "Criminal"

The defendant argues that the penalty imposed by § 1321(b)(6) should more properly be characterized as "criminal" or "penal," rather than "civil," as labeled by Congress. Such a finding would have both constitutional and statutory ramifications.

The guarantees of the fifth and sixth amendments dictate that a criminal penalty cannot be imposed in administrative or civil proceedings, but only in a criminal proceeding, where there are more adequate constitutional safeguards. *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed. 2d 644 (1963). On the other hand, it has long been settled that Congress may provide civil proceedings for the collection of penalties which are civil or remedial sanctions rather than punitive, and prescribe that the determination of facts

---

11. *Appeal docketed,* No. 74–3140, (5th Cir., August 15, 1974).

upon which the liability for such a penalty is based may be made by executive officers or administrative agencies. *Helvering v. Mitchell*, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938); *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013 (1909); *Hepner v. United States*, 213 U.S. 103, 29 S.Ct. 474, 53 L.Ed. 720 (1909); *Passavant v. United States*, 148 U.S. 214, 13 S.Ct. 572, 37 L.Ed. 426 (1893); *Olshausen v. Commissioner of Internal Revenue*, 273 F.2d 23, 27 (9th Cir. 1959), cert. denied, 363 U.S. 820, 80 S.Ct. 1256, 4 L.Ed.2d 1517 (1960).

In addition to the constitutional considerations, the use immunity clause of § 1321(b)(5) provides that information obtained pursuant to notification by the "person in charge" of a facility from which oil is discharged cannot be used against "any such person in any *criminal case,* except a prosecution for perjury or for giving a false statement." (Emphasis added). The defendant argues that if the nominally civil penalty imposed by § 1321(b)(6) is found by the Court to be criminal, then the use immunity provision bars the present proceedings, which originate from the information obtained pursuant to defendant's notification. *Kennedy v. Mendoza-Martinez, supra.*[12]

In analyzing these arguments, three related determinations must be considered: (1) whether the § 1321(b)(6) penalty should be treated as a penal sanction; (2) whether the civil proceedings used to enforce the penalty provide the constitutional protections required

for the type of sanction involved; and (3) does the use immunity provision of § 1321(b)(5) apply to the § 1321(b)(6) penalty.

The test to be applied in determining the civil or criminal nature of a penalty is found in *Kennedy v. Mendoza-Martinez,* 372 U.S. at 168–9, 83 S.Ct. 554, where the Supreme Court listed seven attributes which traditionally have been applied to determine whether an Act of Congress is penal or regulatory in nature. The *Mendoza-Martinez* Court did not actually employ this list in *analyzing* the nature of the statute then before it, because it found that "objective manifestations of congressional purpose indicate conclusively that the provisions in question [automatically forfeiting the citizenship of a person who stays outside the United States in wartime to avoid military service] can only be interpreted as punitive." 372 U.S. at 169, 83 S.Ct. at 568.

The *Mendoza-Martinez* test is actually composed of two stages: first, a determination of whether Congress intended the statute to have a penal or remedial effect; second, if necessary, an analysis of the operative effect of the statute in terms of the seven listed characteristics. If the Court finds that Congress unmistakably intended the sanction as punishment, as the Court found in *Mendoza-Martinez,* then the inquiry is finished. If the congressional intent is ambiguous, however, as it is in the present case, it is necessary to inquire whether the actual effect of the statute is punitive by the standards of the second stage of the test.[13]

---

12. As a necessary part of this argument, the defendant urges the Court to follow *United States v. Mobil Oil Corp.*, 464 F.2d 1124 (5th Cir. 1972), which held as a matter of statutory interpretation that a corporation could be a "person in charge," entitled to statutory immunity even though it has no constitutional right against self-incrimination. *Cf. United States v. Skil Corp.*, 351 F.Supp. 295, 298–99 (N.D.Ill.1972). The *Mobil Oil* opinion has been strongly criticized for taking the teeth out of the federal criminal statutes concerning water pollution. Comment, Compelled Self-Disclosure and Civil Penalties: The Limits of Corporate

Immunity in Oil Spill Cases, 55 Boston U.L. Rev. 112, 119–121, 132–33 (1975). The Court need not reach the *Mobil Oil* issue in the present case, however, because of its conclusion with regard to whether the § 1321(b)(6) civil penalty is a "criminal case" within the meaning of the § 1321(b)(5) immunity provision.

13. There is a third conceivable, though unlikely variation: that the first stage of the test could show clear congressional intent that the sanction have a remedial effect, while its actual effect proved punitive when scrutinized in the second stage.

The defendant urges the Court to follow *United States v. LeBeouf Bros. Towing Co., supra,* in which the district court for the Eastern District of Louisiana applied the *Mendoza-Martinez* test to 33 U.S.C. § 1161(b)(5) (the predecessor of § 1321(b)(6)), and concluded that the sanction imposed was "purely and simply criminal in nature," despite the fact that Congress labeled it as a civil penalty. 377 F.Supp. at 568. The *LeBeouf* Court then construed the use immunity provision in § 1161(b)(4) (the predecessor of § 1321(b)(5)) so that the determination that the § 1161(b)(5) penalty was criminal automatically brought it within the meaning of a "criminal case" to which immunity applied.[14]

> "The nub of disagreement focuses on the categorization of paragraph 5, that is, if the penalty authorized by paragraph 5 is civil in nature, as contended by the government, or is a criminal sanction, as averred by defendant and amici curiae. Moreover, the effect of a determination that paragraph 5 of section 1161 is criminal in nature would subject this penalty to legislative immunity limitations enumerated in paragraph 4." 377 F. Supp. at 562.

The *LeBeouf* opinion does not address the question of the adequacy of fifth and sixth amendment safeguards when the § 1161(b)(5) penalty was imposed in the administrative proceedings. It emphasizes, however, the interplay among the three statutory provisions which (1) criminalize failure to give notice of an oil discharge, (2) grant use immunity in "criminal cases" and (3) provide the strict liability civil penalty. *LeBeouf* terms the relationship among these provisions "an equally, if not more significant area of analysis," 377 F.

Supp. at 566, and says that, together, they form a mechanism unique in federal legislation:

> "To the knowledge of the Court and assumably the litigants, these mutually dependent paragraphs, four and five, constitute sui generis legislation; that is, this statutory situation is the only determinable instance where Congress has coupled a punitive, albeit denominated 'civil,' sanction with a mandatory and criminally enforceable self-notification procedure (the constitutional validity of such procedure being protected by a statutory grant of immunity conterminus [sic] with that of the Fifth Amendment), with the latter procedure invariably triggering imposition of the punitive sanction." *Id.*

The *LeBeouf* opinion declares such a statutory scheme to be impermissible, because it infringes upon fifth amendment rights; and finds that this infirmity would continue to exist, regardless of whether the penalty grounded on the self-notification principle were civil or criminal in nature.

> "Regardless of how the Court classified the paragraph 5 penalty, criminal or remedial, the result is the same: this type of statutory operation is impermissible. Otherwise, Congress would be able to accomplish indirectly what it cannot do directly—impose a penalty on an offense bottomed on information received through the required notification process." *Id.*

■■ Before undertaking a detailed consideration of § 1321(b)(6) in terms of the *Mendoza-Martinez* test, it is useful to state why the Court does not employ either of the *LeBeouf* analyses in reaching its decision in the present case. The fact that Congress has seen fit to

---

14. The *LeBeouf* opinion does not discuss the problem raised in the *Mobil Oil* case, *supra* n. 12, of whether a corporation qualifies for statutory use immunity as a "person in charge" of a vessel or facility that discharges oil. The decision to grant summary judgment for the defendant, based on the immunity provision, incorporates the *Mobil Oil* holding by implication, however, and appropriately so, since the *Mobil Oil* opinion was rendered by the Court of Appeals for the Fifth Circuit, to which appeal of *LeBeouf* now lies.

require a discharger of oil to report the spill, so that it may be promptly contained, does not necessarily prevent it from establishing a civil penalty for that environmentally harmful act, or from permitting the penalty to be assessed through the use of the defendant's notification. Furthermore, insofar as the contrary analysis in *LeBeouf* is based on the fifth amendment, it is inapplicable to the present case, since a corporation has no constitutional privilege against self-incrimination. *George Campbell Painting Corp. v. Reid,* 392 U.S. 286, 288–89, 88 S.Ct. 1978, 20 L.Ed.2d 1094 (1968); *United States v. Mobil Oil Corp.,* 464 F.2d 1124, 1128 (5th Cir. 1972).

While *LeBeouf* likewise concerned a corporate defendant, the opinion did not explain how, in that circumstance, the conclusion that the statutory scheme was constitutionally faulty could be based on the privilege against self-incrimination. Moreover, even if the present case involved a natural person, it would be inappropriate to void the statutory device in the FWPCA on the fifth amendment grounds, without first analyzing it in terms of that line of cases upholding notification requirements in essentially regulatory schemes, *see California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971) and *United States v. Sullivan,* 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927), and those cases which invalidate such requirements in criminal statutes aimed at selective groups inherently suspect of criminal activities: *see Albertson v. SACB,* 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965); *Marchetti v. United States,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); and *Haynes v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968).

The *LeBeouf* reasoning that since the district court decided the § 1321(b)(6) penalty in fact had an effect more penal than regulatory, it is a "criminal case" within the meaning of the § 1321(b)(5)

immunity provision, involves an undesirably loose construction of an immunity statute. Traditionally such statutes have been strictly construed. In *Heike v. United States,* 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450 (1913), Justice Holmes, writing for a unanimous Court, discussed an immunity provision of the Sherman Act:

> "Of course there is a clear distinction between an amnesty and the constitutional protection of a party from being compelled in a criminal case to be a witness against himself. Amendment 5. But the obvious purpose of the statute is to make evidence available and compulsory that otherwise could not be got. We see no reason for supposing that the act offered a gratuity to crime. It should be construed, so far as its words fairly allow the construction, as coterminous with what otherwise would have been the privilege of the person concerned." 227 U.S. at 142, 33 S.Ct. at 227.

Cf. *Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892).

When Congress approved the immunity provision of the FWPCA, it used the phrase "criminal case" to define the scope of its application. In the next paragraph, Congress expressly labeled the sanction now codified in § 1321(b)(6) a "civil penalty." It is plain that Congress did not intend that the immunity provision should apply to actions brought under the civil penalty aspect of the law. A strict construction of the immunity provision requires that the congressional intent to limit its scope should be preserved. If the immunity provision were narrower than the constitutional privilege against self-incrimination, then the compulsory notification requirement might not be enforceable, *see Counselman v. Hitchcock, supra;* and the fifth amendment privilege would be available as a defense where notification had been given. Where a corporate defendant is involved, however, and there is accordingly no constitutional privilege, there is certainly no basis for

extending the statutory privilege beyond the limits imposed by its own terms.

In the present case, therefore, the inquiry into the nature of the § 1321(b)(6) penalty is aimed at determining whether it can be imposed in administrative or civil proceedings consistently with the safeguards established for criminal prosecutions by the fifth and sixth amendments. If the penalty is criminal according to the *Mendoza-Martinez* test, then it can only be imposed in criminal proceedings; if it is a regulatory penalty under that test, then the only limits on its imposition in administrative or civil proceedings are "the more amorphous protections of due process." *Atlas Roofing Co. v. Occupational S. & H. Rev. Com'n.*, 518 F.2d 990, 994 (5th Cir. 1975).

The Supreme Court has acknowledged that determining the criminal or civil nature of a penalty can be "extremely difficult and evasive of solution." *Kennedy v. Mendoza-Martinez*, 372 U.S. at 168, 83 S.Ct. at 567. The test set forth in the *Mendoza-Martinez* opinion is as follows:

"[1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions. Absent conclusive evidence of congressional intent as to the penal nature of a statute, these factors must be considered in relation to the statute on its face." 372 U.S. at 168–9, 83 S.Ct. at 567 (footnotes omitted).

■  In attempting to show that the § 1321(b)(6) penalty is criminal in nature under this test, the defendant has a heavy burden, since Congress specifically labeled it a "civil penalty" and there do exist separate criminal statutes applicable to oil discharges.[15]  As Judge Friendly aptly observed in *United States v. J. B. Williams Co., Inc.*, 498 F.2d 414, 421 (2d Cir. 1974),

"When Congress has characterized the remedy as civil and the only consequence of a judgment for the Government is a money penalty, the courts have taken Congress at its word."

Thus in applying the teachings of the *Mendoza-Martinez* tests to the civil penalty imposed by § 1321(b)(6), the Court is not persuaded that the statutory civil penalty is in fact a criminal sanction.

*(1) Whether the sanction involves an affirmative disability or restraint*

Although the deterrent effect of a money penalty could be termed a restraint, *Atlas Roofing, supra*, 518 F.2d at 1001, the cases cited by the Supreme Court where this factor indicated a criminal penalty concerned quite different sanctions, such as exclusion from practice of law in the courts of the United States, *Ex parte Garland*, 4 Wall. 333, 377, 71 U.S. 333, 18 L.Ed. 366 (1866), and denial of federal employment, *United States v. Lovett*, 328 U.S. 303, 316, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). Thus this factor does not lend material support to the defendant's position.

*(2) Whether the sanction has historically been regarded as punishment*

The *LeBeouf* Court was of the opinion that a monetary penalty "traditionally has been regarded as a measure of criminal punishment," 377 F.Supp. at 564, citing *United States v. Krapf*, 180 F. Supp. 886 (D.N.J.1960), *aff'd*, 285 F.2d 647 (3rd Cir. 1961) and *United States v. Futura, Inc.*, 339 F.Supp. 162 (N.D.Fla. 1972). In each of these cases, however, the statute in question imposed a "fine" for a deliberate violation of law, and

15.  *E. g.*, 33 U.S.C. §§ 407 and 411.

each of these opinions distinguished such "fines" from valid civil penalties.[16] Although fines are a form of punishment, money penalties have traditionally been accepted where they serve a remedial rather than a punitive function. *Atlas Roofing,* 518 F.2d at 1001. The historical usage, therefore, does not clarify the criminal or civil nature of a money penalty, but leads back to the question of whether its effect is remedial or punitive.

*(3) Whether the sanction comes into play only on a finding of scienter*

This factor clearly points toward the remedial function of the § 1321(b)(6) penalty, since there is no requirement of *scienter* in the present statute. This emphasizes a significant distinction between this case and *LeBeouf,* which concerned § 1161(b)(5), the pre-1972 statute, which specifically included the element of acting "knowingly," as a condition precedent before liability became established under the civil penalty clause.

*(4) Whether the sanction's operation will promote the traditional aims of punishment—retribution and deterrence*

The only indication that the statute may serve the aim of retribution is the requirement that the gravity of the violation be considered in fixing the amount of the penalty. This is not the basic thrust of § 1321(b)(6), however, which is aimed less at the *acts* of polluters than at the resulting pollution itself. In this sense the civil penalty provision differs from Section 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 et seq. (Refuse Act), which aims its criminal sanctions "not at the polluting substance *per se* but at the

acts of the polluter. . . ." *United States v. Tobin Packing Co., Inc.,* 362 F.Supp. 1127, 1129 (N.D.N.Y.1973).

The civil penalty provision, when effectively enforced, no doubt deters oil discharges by making care more economical than carelessness.[17] The Government contends that this does not make the sanction criminal, however, since deterrence is a proper purpose of a civil penalty. The extensive use of civil penalties to bring about compliance with the regulations and orders of administrative agencies is well illustrated by the listing in the *Atlas Roofing* opinion of almost one hundred federal statutes employing this device. 518 F.2d at 1003–1009. The Government may appropriately assess monetary penalties by administrative enforcement as a function of its sovereign power within constitutional limits, to control those matters within the competence of the national Government. *Atlas Roofing,* 518 F.2d at 1002, citing *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013 (1909); *Lloyd Sabaudo Societa v. Elting,* 287 U.S. 329, 333–35, 53 S.Ct. 167, 77 L.Ed. 341 (1932); *Elting v. North German Lloyd,* 287 U.S. 324, 53 S.Ct. 164, 77 L.Ed. 337 (1932); *Hepner v. United States,* 213 U.S. 103, 29 S.Ct. 474, 53 L.Ed. 720 (1909); *Passavant v. United States,* 148 U.S. 214, 13 S.Ct. 572, 37 L.Ed. 426 (1893); and *Bartlett v. Kane,* 16 How. 263, 57 U.S. 263, 14 L.Ed. 931 (1885). Thus by itself the function of deterrence does not indicate a criminal sanction.

*(5) Whether the behavior to which it applies is already a crime*

Two of the cases cited by the Supreme Court relating to this principle, *Lipke v. Lederer,* 259 U.S. 557, 42 S.Ct. 549, 66

---

16. See Comment, Compelled Self-Disclosure and Civil Penalties: The Limits of Corporate Immunity in Oil Spill Cases, 55 Boston U.L.Rev. 112, 127–28 (1975) and Marshall, Environmental Protection and the Role of the Civil Money Penalty: Some Practical and Legal Considerations, 4 Environmental Affairs 323, 366 n. 201 (1975). These arti-

cles also criticize the *LeBeouf* rationale in its entirety.

17. For a succinct analysis of the "cost internalization" approach to controlling pollution, see Marshall, *supra* n. 16, 4 Environmental Affairs at 324–34.

L.Ed. 1061 (1922) and *United States v. LaFranca,* 282 U.S. 568, 572–73, 51 S.Ct. 278, 75 L.Ed. 551 (1931), invalidated taxes levied against one charged with liquor violations under the Volstead Act, because the sanction had the characteristics of a fine rather than a tax. The third case, *United States v. Constantine,* 296 U.S. 287, 295, 56 S.Ct. 223, 80 L.Ed. 233 (1935), involved a similar holding where the tax was conditioned on commission of a crime under state law. In contrast to those cases, the § 1321(b)(6) penalty has not been triggered by the bringing of charges under the criminal provisions of the Refuse Act, and thus does not constitute a means of adding additional punishment to that provided by the criminal law. Although a criminal violation of the Refuse Act is similar to a violation of § 1321(b)(6), in that the element of *scienter* is not required, *United States v. American Cyanamid Co.,* 354 F.Supp. 1202 (S.D.N.Y. 1973) *aff'd,* 480 F.2d 1132 (2d Cir. 1973), this does not transform the otherwise civil penalty into a criminal one. The factor of whether the act to which the sanction applies was already a crime points to the criminal nature of the sanction only where its function is to punish rather than regulate. In isolation, this factor leaves the civil or criminal nature of § 1321(b)(6) ambiguous.

*(6) Whether an alternative purpose to which the sanction may rationally be connected is assignable to it*

The overriding purposes of the civil penalty provision of the FWPCA appear to be the elimination of oil spills through deterrence, and the collection of revenue to support federal clean-up efforts and the administration of the act. The civil penalty has an effect akin to punishment, but this is an unavoidable by-product of these purposes. The Court cannot substitute its own judgment for the informed choice of the Congress by interpreting this by-product to be the primary purpose of the statute. *See Atlas Roofing,* 518 F.2d at 1010.

*(7) Whether the sanction appears excessive in relation to the alternative purpose assigned*

The money penalty imposed by § 1321(b)(6) cannot be said to be excessive, since the factors to be taken into account in fixing the amount of the penalty provide flexibility to accommodate the facts of the violation.

In *Atlas Roofing, supra,* the Court of Appeals for the Fifth Circuit recently applied the *Mendoza-Martinez* test and upheld, against a constitutional attack similar to that raised by defendant herein, a civil money penalty imposed by the Secretary of Labor under the Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. § 651 et seq., for violation of a regulation requiring roof openings to be adequately covered. There is insufficient difference between the OSHA penalty and that imposed by § 1321(b)(6) to warrant a different conclusion in the present case. This Court finds that the civil penalty established by § 1321(b)(6) is remedial in nature, and can be imposed in administrative or civil proceedings in harmony with the fifth and sixth amendments.

*The Amount of the Penalty*

The only remaining question concerns the amount of the imposed penalty which the defendant is lawfully required to pay. The Government has orally conceded and stipulated, that this action is in the form of a trial *de novo,* but has not claimed that the Court may make *de novo* findings only on the facts indicating liability and not on the amount of the penalty. Cf. *United States v. Independent Bulk Transport, Inc.,* 394 F. Supp. 1319, 1322 (S.D.N.Y.1975). A trial *de novo* necessarily permits the Court to consider whether the sanction imposed by the administrative agency conforms to the facts brought out at trial. *Cross v. United States,* 512 F.2d 1212, 1218–19 (4th Cir. *en banc* 1975). The Court cannot prescribe an alternate penalty based merely on its sense of justice and reason, but must be bound by

the statute and the regulations properly issued for its enforcement. *Id.* The fact that the parties' stipulation of the facts made a trial unnecessary in the present case does not alter these principles.

The statute imposing the civil penalty provides that three factors must be considered in fixing the amount of the penalty:

> ". . . the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business and the gravity of the violation . . . ." 33 U.S.C. § 1321(b)(6).

The Coast Guard interpretation of these provisions is contained in a statement dated February 23, 1973 and entitled "Coast Guard Policy for the Application of Civil Penalties Under Section 311(b)(6), FWPCA," which is printed as an appendix to the *LeBeouf* opinion, 377 F.Supp. at 569–70.

The policy statement makes clear that the first two factors—relating to the size of the business of the charged party and his ability to continue in that business—have little importance in the present case. Consideration of these factors is apparently designed to avoid the assessment of penalties which would do inordinate financial harm to a small business or even drive it into bankruptcy. That the defendant does not run these risks exceeds the patently obvious. There is nothing to indicate that the size of a business must be considered so that the penalty may be increased to maximum for a large enterprise. Thus it is on the third factor—the gravity of the violation—that the size of the penalty in this case turns.

The portion of the Coast Guard policy statement interpreting this factor reads as follows:

> "A number of considerations may be made in determining the gravity of a violation, such as the degree of culpability associated with the violation, the prior record of the responsible party, and the amount of oil discharged. Substantial intentional discharges should result in severe penalties, as should cases of gross negligence, and so on. This is not to suggest that other considerations may not combine to determine the gravity of a violation." 377 F.Supp. at 569.

The statement also emphasizes that two factors—the discharger's efforts or expense in removing the spilled oil and any decision by state or federal authorities to bring criminal charges as a result of the spill—should not be considered in fixing the amount of a civil penalty.

In the present case there is no indication of prior discharges at the defendant's plant, nor was this discharge the result of deliberate actions by the defendant's employees within the scope of their employment. The amount of oil discharged undoubtedly was potentially harmful to the environment; but it was not of such proportion that it could not be completely removed within a relatively short time. Were it not for the defendant's policy of care in draining the tanks of all but the amount of oil essential to maintain the premises, the environmental impact would likely have been far greater.

On the stipulated record, the Court concludes that the defendant was not negligent or at fault in any way for this discharge of oil. In other words, its culpability was zero; however, the Coast Guard hearing examiner did conclude somewhat differently:

> "The culpability. Since the incident was caused by a third party the negligence is minimal but not zero. The valves which were operated to permit the discharge, were not locked. Also, although they did have a security force available, they were not utilized except on weekends. In this they probably took a calculated risk because of costs considerations [sic] and the consequences are theirs, not the public's."

The hearing examiner's finding is at odds with the stipulated facts, that the defendant's security force patrolled the plant three times a day, seven days a week. His finding of negligence was therefore based in part on information which must be considered erroneous. This error is compounded by the examiner's subjective speculation concerning the motives for a decision the defendant did not make. This leaves the fact that the valves were unlocked, as the only basis for the finding of "negligence." This circumstance alone cannot be considered negligence, in light of the protective barrier of two high fences topped with barbed wire, the entrances to which were securely chained and padlocked to prevent unauthorized persons from gaining access to the valves. There is nothing in the record to indicate that the valves had to be locked to comply with the then prevailing standard of due care in the handling of oil prior to the time the Government saw fit to issue amended regulations requiring, among other things, the locking of such valves. *See supra* n. 2.

If this case had involved the review of an administrative decision, under the standards of the Administrative Procedure Act, 5 U.S.C. § 701 et seq., the Court would hold it an abuse of discretion to impose more than a nominal penalty based on the evidence in the factual stipulation. Since this is a *de novo* review, however, the Court will simply enter summary judgment for the plaintiff United States in the amount of one dollar.

So ordered.