**MONTAUK OIL TRANSPORTATION CORP., Plaintiff–Appellant,**

v.

**TUG "EL ZORRO GRANDE", her engines, boilers, etc., in rem, Turecamo Coastal & Harbor Towing Corp. and Turecamo Maritime, Inc., in personam, Defendants–Appellees.**

No. 607, Docket 94–7436.

United States Court of Appeals, Second Circuit.

Argued Oct. 26, 1994.

Decided May 5, 1995.

Raymond A. Connell, New York City (Connell, Losquadro & Zerbo, New York City, of counsel), for plaintiff-appellant.

Stephen J. Buckley, New York City (Kenny & Stearns, New York City, of counsel), for defendants-appellees.

Before: VAN GRAAFEILAND, McLAUGHLIN and LEVAL, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Montauk Oil Transportation Corp., owner of the oil barge CIBRO PHILADELPHIA, appeals from a judgment of the United States District Court for the Southern District of New York (Martin, J.) dismissing Montauk's in rem claim against the tug EL ZORRO GRANDE and its in personam claim against the tug's owner Turecamo Coastal & Harbor Towing Corp., which merged into Turecamo Maritime, Inc. Montauk seeks indemnification for payments it made to New York State pursuant to New York's Environmental Conservation Law and Navigation Law and to the United States pursuant to the Federal Water Pollution Control Act. The alleged basis for these payments was an oil spill in the Hudson River caused by the negligent operation of the EL ZORRO

GRANDE while towing the CIBRO PHILA-DELPHIA on September 15, 1989. Montauk's cause of action based on the New York payment was dismissed following a non-jury trial. Its claim based on the federal payment was dismissed by a summary judgment order which became part of the final judgment on appeal. We affirm the district court's decision dealing with the New York payment but reverse that part dealing with the federal payment.

## THE NEW YORK PAYMENT

Article 17 of New York's Environmental Conservation Law contains numerous general and specific provisions aimed at preventing water pollution; Article 12 of New York's Navigation Law contains specific provisions against the discharge of petroleum. On March 26, 1991, New York's Department of Environmental Conservation (the "DEC") instituted a proceeding against six related Cibro companies (collectively, the "Cibro Group"), which included Montauk as owner of the CIBRO PHILADELPHIA, alleging thirty causes of action for violations of these laws and requesting an award of $7.5 million. Twenty-eight of the claims involved violations associated with land-based oil storage facilities. The remaining two involved oil spills from the CIBRO PHILADELPHIA that occurred on September 15, 1989 and December 15, 1989. A settlement agreement subsequently was reached under which the Cibro Group agreed to pay $2.5 million in satisfaction of the claim. The first installment payment under the agreement was to be in the amount of $500,000 and was to be made with two $250,000 checks, one of which was to be payable to the New York State Department of Environmental Conservation Environmental Enforcement Account and the other to the New York Environmental Protection and Spill Compensation Fund. Two such checks were delivered by Montauk, apparently on behalf of all the involved Cibro companies. It appears that no further payments were made thereafter because the Cibro companies, other than Montauk, filed for Chapter 11 relief. No allocation of the $500,000 payment among the thirty claims was made.

Montauk then brought this suit against Turecamo and EL ZORRO GRANDE seeking indemnification for that portion of the fine attributable to the September 15, 1989 spill. Turecamo admitted that its negligence in operating EL ZORRO GRANDE caused the spill. Most of the trial focused on ascertaining what portion of the fine paid by Montauk was due to the September spill. One of the Cibro Group's attorneys testified that a DEC official had told him the amount that the DEC had allocated to the two CIBRO PHILADELPHIA spills. The attorney stated that he was not sure of the exact figure because his recollection of the conversation was "slightly unclear," but that it was $200,000, $220,000, or $225,000. Another lawyer for the Cibro Group opined that allocating $225,000 of the settlement to the two spills was "reasonable" and that a 50–50 sub-allocation between the two spills was "appropriate." The DEC attorney involved in negotiating the Cibro Group settlement stated that, if he had provided any allocation of the penalties, he could not remember the exact amounts. However, he did recall that any apportionment figures discussed were based on the $7.5 million demand rather than the $2.5 million settlement. Moreover, he believed that when viewed in relation to the amount assigned to the total alleged violations, the allocation of $225,000 to the two CIBRO PHILADELPHIA spills seemed excessive. Defendants also introduced testimony to the effect that most, if not all, of any allocation should be attributed to the December 1989 spill. Defendants' witness, an oil-spill cleanup manager who observed both spills, testified that the December 1989 spill involved at least ten times more fuel than the September 1989 spill. Moreover, Montauk's own witness admitted on cross-examination that, because of the Cibro Group's failure to clean up contamination caused by the December spill, it faced allegations of continuing violations of New York environmental laws which might make it subject to potentially enormous penalties.

The district court found that Montauk failed to prove that the DEC set $225,000 as the amount to be paid for the two spills. Furthermore, assuming that such allocation was made, Montauk failed to prove how the

$225,000 was divided between the two spills, which had substantially different disastrous results. It therefore dismissed the cause of action based on the New York payments. There was no error here.

■ If an indemnitee fails to give the indemnitor notice of a proposed settlement and meaningful opportunity to assume the defense, the settling indemnitee is not entitled to indemnification unless it can establish the amount of the indemnified liability. *See Atlantic Richfield Co. v. Interstate Oil Transport Co.,* 784 F.2d 106, 113 (2d Cir.), *cert. denied,* 479 U.S. 817, 107 S.Ct. 75, 93 L.Ed.2d 31 (1986); *B.S. Livingston Export Corp. v. M/V Ogden Fraser,* 727 F.Supp. 144, 148 (S.D.N.Y.1989). Because the Turecamo defendants were not afforded an opportunity to defend New York's claim against the Cibro Group or to participate in the settlement with the DEC, Montauk was required to establish the amount of its liability for the September spill to avoid forfeiting its indemnity claim. It failed to do so. The district court therefore had no alternative save to dismiss Montauk's claim for indemnification related to that loss.

## THE FEDERAL PENALTY

■ In addition to the state penalties assessed against Montauk and her sister companies, Montauk alone was assessed a fine of $3,500 for violating the Federal Water Pollution Control Act Amendments of 1972 (the "Act"), Pub.L. No. 92–500, § 311(b)(3) & (6), 86 Stat. 816, 864–65 (codified as amended at 33 U.S.C. § 1321(b)(3) & (6)) and also 40 C.F.R. § 110.3. These statutory provisions provide in substance that the owner, operator or person in charge of a vessel from which oil is harmfully discharged shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense.

Section 1321(h) of 33 U.S.C. provides in part:

*Rights against third parties who caused or contributed to discharge*

The liabilities established by this section shall in no way affect any rights which (1) the owner or operator of a vessel ... may have against any third party whose acts may in any way have caused or contributed to such discharge....

The district court, relying on the case of *Tug Ocean Prince, Inc. v. United States,* 436 F.Supp. 907 (S.D.N.Y.1977), *aff'd in part on other grounds and rev'd in part on other grounds,* 584 F.2d 1151 (2d Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979), held that, although section 1321(h) provides generally for indemnity, it does not apply to fines imposed pursuant to section 1321(b)(6). We have examined the appellate briefs of the parties in the *Tug Ocean Prince* case and find no arguments addressed to the merits of this blanket statement. That case involved a collision between a Pittston Marine Transport barge under tow by the OCEAN PRINCE and a rock in the Hudson River. Tug Ocean Prince, Inc. brought an action for exoneration from or limitation of liability pursuant to 46 App. U.S.C. § 183. After Pittston filed a claim in the limitation proceeding for damages to the barge and its cargo, Tug Ocean Prince brought a third-party action against the United States alleging negligent maintenance of a buoy. Pittston then cross-claimed against the United States for the amount of its damages, and the United States counterclaimed for the amount of its cleanup costs. The United States also brought a separate action against the tug and the barge for its cleanup expenses. The district court found that Tug Ocean Prince was entitled to limit its liability and that Pittston was entitled to a judgment in this limited amount. It dismissed the Government's claim against Pittston. It dismissed both Tug Ocean Prince's and Pittston's claims against the Government. It remanded a $5,000 fine levied against Pittston to the Coast Guard for reconsideration and dismissed Pittston's claims against Tug Ocean Prince for indemnity. 436 F.Supp. at 926–27.

Pittston appealed from so much of the court's decision "which permitted Plaintiffs to limit their liability to the value of the 'OCEAN PRINCE.'" (Defendant–Appellant's Brief at 3). Tug Ocean Prince, arguing that the Government's negligence was a contributing cause of the accident, stated "[t]he

decision below should therefore be reversed on this single issue." (Cross–Appellants' Brief at 9). The merits of Pittston's claim of indemnity for payments made under section 1321(b)(6) were not addressed.

As a general rule, a Court of Appeals will not pass upon issues that were not presented in the appellants' briefs. *See, e.g.,* Fed. R.App.P. 28(a)(3)–(5); *NLRB v. Star Color Plate Serv.,* 843 F.2d 1507, 1510 n. 3 (2d Cir.), *cert. denied,* 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 58 (1988); *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation,* 605 F.2d 648, 653 n. 3 (2d Cir. 1979); *Calvert v. Katy Taxi, Inc.,* 413 F.2d 841, 850 (2d Cir.1969). Although visiting Senior District Judge Mehrtens wrote an 11–page opinion of affirmance in *Tug Ocean Prince,* he confined his remarks almost entirely to the issues designated in the appellate briefs and did not consider the issue presently before us. Accordingly, we are free to address the issue on this appeal. *See Dunbar v. Henry Du Bois' Sons Co.,* 275 F.2d 304, 306 (2d Cir.), *cert. denied,* 364 U.S. 815, 81 S.Ct. 45, 5 L.Ed.2d 46 (1960).

The fines, penalties and recoveries provided for in section 1321 fall into two separate and distinct categories, the first dealing with the act of spillage and the second dealing with the cost of cleanup. Section 1321(b)(6), the spillage section, provides in substance that the owner, operator or person in charge of a vessel from which oil is harmfully discharged shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense. Section 1321(f)(1), dealing with cleanup costs, provides in pertinent part that except where an owner or operator can prove that the discharge of oil was caused solely by the act or omission of a third party, such owner shall be liable for cleanup costs in certain specified amounts.

Each of the above-described categories stands on its own. The penalty provided in the first category is not predicated upon the cost of removal, but upon the happening of the discharge. The determinative factor in category one is the discharge of oil, not its cleanup. *United States v. W.B. Enterprises, Inc.,* 378 F.Supp. 420, 422 (S.D.N.Y.1974).

*See also United States v. General Motors Corp.,* 403 F.Supp. 1151, 1164 (D.Conn.1975). If the discharge in the instant case was caused by the negligence of defendants-appellees, established equitable principles of admiralty and tort should provide Montauk with a third-party claim against them.

■ The concept of indemnity is as old as the proverbial hills and long has been recognized in the law of admiralty. *See, e.g., Jones v. Waterman S.S. Corp.,* 155 F.2d 992, 999 (3d Cir.1946). Former Admiralty Rule 59, recodified in 1921 as Admiralty Rule 56, and subsequently codified in substance as Fed.R.Civ.P. 14(c), has furnished procedural support for the exercise of this concept through interpleader. *See Marubeni–Iida (America), Inc. v. Toko Kaiun Kabushiki Kaisha,* 327 F.Supp. 519, 521–22 (S.D.Tex. 1971). When in the instant case the EL ZORRO GRANDE undertook the towage of Montauk's barge, it assumed the obligation of performing this task in a workmanlike manner. *See Fairmont Shipping Corp. v. Chevron Int'l Oil Co.,* 511 F.2d 1252, 1259–60 (2d Cir.), *cert. denied,* 423 U.S. 838, 96 S.Ct. 66, 46 L.Ed.2d 57 (1975). Its conceded negligence should make it responsible for the damage sustained by the barge owner, in this instance the civil penalty imposed under section 1321(b)(6).

■ Had Congress intended to eliminate this traditional rule of equitable indemnity in cases involving federal penalties for oil spillage, it easily could have done so. Instead, it strengthened the traditional rule by specifically providing for indemnity. *See* 33 U.S.C. § 1321(h). The word "liabilities" as used in section 1321(h) is broad enough to encompass the civil penalties that are imposed under section 1321(b)(6). In *Black's Law Dictionary,* "liability" is defined as a "broad legal term", of "the most comprehensive significance", including "penalt[ies]." (Rev'd 4th ed.) (citations omitted). As we see it, the absence of section 1321(f)(1)'s third-party liability defense in section 1321(b)(6) spillage cases does no more than insure that the penalty ($5,000 or less) will be paid regardless of fault and regardless of whether the government incurs cleanup costs. *See W.B. Enterprises, supra,* 378 F.Supp. at 422–23.

In other words, as between the federal government and the barge owner, the issue of fault for oil spillage is not a liability-determinative issue. However, as between the tug and the barge it is a very material issue. If the tug's improper conduct caused loss to the barge, the latter should be indemnified. *See McDermott v. City of New York*, 50 N.Y.2d 211, 216–17, 428 N.Y.S.2d 643, 406 N.E.2d 460 (1980). Because the defendants-appellees concede their responsibility for the accident, Montauk is entitled to indemnification for the $3,500 liability that resulted. We therefore reverse the district court's denial of this recovery and remand to that court for entry of a judgment in favor of Montauk in the sum of $3,500.

Affirmed as to the dismissal of the claim of indemnity for the payments to the State of New York. Reversed and remanded as to the federal penalty. No costs to either party.