**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**MARATHON PIPE LINE COMPANY,**
**Defendant-Appellant.**

**No. 78–1453.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1978.

Decided Dec. 22, 1978.

John P. Ewart, Craig & Craig, Mattoon, Ill., for defendant-appellant.

Robert L. Simpkins, Asst. U. S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, and BAUER and WOOD, Circuit Judges.

CASTLE, Senior Circuit Judge.

██ Marathon Pipe Line Company appeals from the district court's enforcement by way of summary judgment of a $2,000 civil penalty assessed by the United States Coast Guard against Marathon under section 1321(b)(6) of the Federal Water Pollution Control Act (FWPCA)[1] for a discharge of oil into navigable waters in violation of section 1321(b)(3) of the Act. The issue presented is whether section 1321(b)(6) permits the Coast Guard to assess more than a nominal civil penalty against the owner of a discharging facility where the owner is without fault and the spill was caused by a third party.[2] Affirming the district court, we hold that section 1321(b)(6) is an absolute liability provision which contemplates a substantial penalty even in the absence of fault and, accordingly, that the Coast Guard did not abuse its discretion in assessing a $2,000 civil penalty for a discharge of 19,992 gallons of crude oil.

On November 20, 1975 Marathon was notified by local police that a pipeline owned by it had ruptured and was discharging crude oil into the Kaskaskia River in southern Illinois. The company immediately took steps to contain the spill and reported the occurrence to the United States Environmental Protection Agency. In all, 19,992 gallons of crude oil were discharged from the pipeline and 10,920 gallons were recovered or burned, so that approximately 9,072 gallons escaped downriver. Subsequent investigation by the company revealed that a bulldozer had struck the four-

---

1. 33 U.S.C. § 1321(b)(6) (1976). All references to the FWPCA in this opinion are to the 1972 and 1973 amended version. The 1977 amendments, which changed the wording of section 1321(b)(6), do not apply to this case as the spill occurred in 1975.

2. Marathon does not contest the propriety of a *nominal* civil penalty in this situation. In *United States v. Tex-Tow, Inc.*, 589 F.2d 1310 (7th Cir. 1978), decided this same day, the company argued that no penalty at all, nominal or substantial, may be imposed in the alleged absence of "causation" on its part.

inch buried pipe back in June or July of 1975 while hired to dig an irrigation ditch for the owners of the land. The bulldozer operator had reported the damage to the landowners, but as the latter thought that the pipeline was no longer in use, neither ever reported the damage to Marathon. The location of the pipeline was a matter of public record, the easement having been duly recorded with the local recorder's office, and the pipeline was marked in accordance with all federal regulations. It is undisputed that the eventual split in the line resulted from the bulldozer damage and that Marathon was in no way at fault in not learning of either the digging or the damage at any time prior to the spill.

### The Statutory Scheme

The FWPCA was enacted "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Toward that end Congress set the goal of eliminating the discharge of all pollutants into navigable waters by 1985. § 1251(a)(1). Section 1321, dealing with oil and hazardous substance liability, sets a "no discharge" policy of immediate effect and prohibits any discharge in harmful quantities. §§ 1321(b)(1) & (3). The section holds owners or operators of discharging facilities[3] liable for clean-up costs, subject to the defenses of act of God, act of war, negligence of the United States Government, or act or omission of a third party. § 1321(f). If the discharged substance is nonremovable, the owner or operator is liable to a variable civil penalty

dependent on the amount and toxicity of the substance spilled.[4] This "liquidated damages liability" is again subject to the four enumerated defenses. § 1321(b)(2)(B)(iii). Finally, section 1321(b)(6), the immediate focus of our concern here, makes owners and operators liable to a civil penalty of up to $5,000, with no provision for any defenses but with the amount of the penalty to be determined by the Coast Guard, which is instructed to take into account ability to pay and "gravity of the violation."[5]

### Marathon's Statutory and Abuse of Discretion Claims

The civil penalty provision is clearly one of strict liability since fault is not even a requisite for clean-up or liquidated damages liability, and every court which has considered the question has so held. *See, e. g., Tug Ocean Prince, Inc. v. United States,* 436 F.Supp. 907, 924 (S.D.N.Y.1977); *United States v. Atlantic Richfield Co.,* 429 F.Supp. 830, 836–37 (E.D.Pa.1977); *Ward v. Coleman,* 423 F.Supp. 1352, 1357 (W.D.Okl. 1976); *United States v. General Motors Corp.,* 403 F.Supp. 1151, 1157 (D.Conn.1975); *United States v. Eureka Pipeline Co.,* 401 F.Supp. 934, 942 (N.D.W.Va.1975). However, Marathon claims that, although civil penalty liability attaches without regard to fault, a nominal amount only may be assessed in the absence of any fault on its part. We do not regard *General Motors, supra,* which also involved zero fault and third party causation, as authority for such a proposition, as the court in that case

---

3. The term "discharging facilities" shall be used where the statute refers to "vessel, onshore facility, or offshore facility."

4. The EPA is charged with drawing up a schedule assigning appropriate per unit penalties to various nonremovable substances. § 1321(b)(2)(B)(iv).

5. Section 1321(b)(6) states:

Any owner or operator of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of [section 1321(b)(3)] shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each

offense. No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearing on such charge. Each violation is a separate offense. Any such civil penalty may be compromised by such Secretary. In determining the amount of the penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner of operator's ability to continue in business, and the gravity of the violation, shall be considered by such Secretary. . . .

assessed the one dollar penalty pursuant to the exercise of its own sound discretion in a *de novo* trial. Here, by contrast, we are asked to review the exercise of discretion by an administrative agency.

In effect, Marathon would have us read into the statute a strict standard of liability for a nominal penalty and a negligence standard of liability for a substantial penalty. We do not believe the plain language of the statute supports different standards for a substantial as opposed to a nominal penalty. We must construe a statute according to its ordinary meaning unless Congress clearly did not intend it to have such meaning, as determined from other parts of the statute or legislative history, or unless Congress could not have intended it to have such a meaning because it would render the statute unconstitutional. *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917); *March v. United States,* 165 U.S.App.D.C. 267, 506 F.2d 1306, 1313–16 (1974). For reasons explained in the section of this opinion dealing with the constitutional issue, we believe the intent of Congress, as manifested in section 1321 taken as a whole,[6] is to impose a substantial civil penalty on owners or operators even in the absence of fault and that such an intent is well within the constitutional powers of Congress.

Marathon does not directly address the issue of congressional intent, arguing instead that the Coast Guard misapplied its own administrative guidelines in fixing the amount of the penalty. The statute directs the Coast Guard to consider, in setting a penalty, the owner's ability to pay and the "gravity of the violation." The Coast Guard has interpreted the latter to include size of the spill, the owner's prior record, and the "degree of culpability."[7] Thus degree of fault is but one of several factors the Coast Guard will consider in setting a penalty.[8] There is no allegation here that the Coast Guard did not consider absence of fault as a mitigating factor, and the evidence indicates that it did, as it is the Coast Guard's stated policy to assess a penalty at or near the maximum of $5,000,[9] and Marathon has offered no evidence to show that a spill of crude oil of this magnitude would not ordinarily result in the maximum penalty. Accordingly, we find that the statute allows a substantial penalty in the circumstances of this case and that the Coast Guard did not abuse its discretion in assessing one.[10]

### The Substantive Due Process Claim

Marathon asserts that the purpose of the civil penalty is to deter spills and that assessing a substantial civil penalty in the absence of fault does not meet the due process requirement that legislative means bear "a reasonable relation to a proper legislative purpose, and [be] neither arbitrary nor discriminatory." *Nebbia v. New York,* 291 U.S. 502, 537, 54 S.Ct. 505, 536, 78 L.Ed. 940 (1934). First, we note that the Supreme Court has not invalidated an economic regulation on substantive due process grounds since 1937[11] and that even in the *Nebbia* case relied on by Marathon the

**6.** The legislative history does not speak to the issue of a substantial penalty in the absence of fault, so the statute itself is our only guide.

**7.** "Coast Guard Policy for the Application of Civil Penalties under Section 311(b)(6), FWPCA," reprinted as an appendix to *United States v. LeBeouf Bros. Towing Co., Inc.,* 377 F.Supp. 558, 569 (E.D.La.1974).

**8.** We note that interpretation of a statute by the agency primarily concerned with its interpretation is relevant to proper judicial interpretation of the statute. *L'Enfant Plaza Properties, Inc. v. D. C. Redevelopment Land Agency,* 184 U.S.App.D.C. 30, 564 F.2d 515 (1977).

**9.** "Coast Guard Policy," *supra* note 7.

**10.** Marathon attacked the $2,000 penalty only on the basis of its lack of culpability, but in *Tex-Tow, supra* note 2, the company argued that it did· not "cause" the spill since a third party "caused" it.

**11.** G. Gunther, Constitutional Law Cases and Materials 591 (9th ed. 1975). "Economic regulation" is used in contrast to regulation of non-economic personal interests. *Id.* at 565, 567. The civil penalty would clearly be an economic regulation as no personal or non-economic interest of Marathon is involved.

Court adopted a deferential stance toward a state legislature,[12] sustaining legislative regulation of milk prices against a retailer's assertion of freedom of contract and property right claims.

▮ Aside from the deference we would in any event have to accord Congress in the field of economic regulation, Marathon's claim suffers from the more basic defect that deterrence is not the sole purpose of the civil penalty, or for that matter of strict liability in general. Strict liability, though performing a residual deterrent function, is based on the economic premise that certain enterprises ought to bear the social costs of their activities.[13] In the FWPCA in general, Congress has made a legislative determination that polluters rather than the public should bear the costs of water pollution.[14] In section 1321, the clean-up, liquidated damages, and civil penalty liabilities all serve to shift the cost of oil and hazardous substance pollution onto the private sector. The economic, rather than deterrent, rationale underlying section 1321 is evidenced by the fact that none of the three liabilities created by the section is conditioned on a finding of fault. The fact that Congress carved out very narrow defenses (not including absence of fault) to the first two liabilities does not invalidate a third liability not accorded any defenses at all. Congress had the power to impose a full enterprise liability on the private sector but instead opted for the compromise position of narrow defenses for the first two liabilities and no defense to the third and most limited liability, which in any event could not exceed $5,000.

▮ The purpose of the FWPCA and of section 1321 is to achieve the result of clean water as well as to deter conduct causing spills. The civil penalty serves the Act's goal of pollution-free water by providing a means of funding the administration and enforcement of the Act. Under section 1321(k) the proceeds of civil penalty collections are to be deposited in a revolving fund which is to be used to finance a National Contingency Plan for the containment, dispersal, and removal of spills; the clean-up of maritime disaster discharges; the reimbursement of clean-up costs incurred by owners or operators who are able to establish one of the four defenses; and the administration of the act. §§ 1321(c), (d), (i), and (*l*). The principle of financing regulation through a penalty or forfeiture imposed on regulatees is not novel, *One Lot Emerald Cut Stones v. United States,* 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972), nor is basing such penalty or forfeiture on ownership of the offending thing, regardless of fault, violative of due process, *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (ownership of yacht on which marijuana was found), *Edelberg v. Illinois Racing Bd.,* 540 F.2d 279 (7th Cir. 1976) (ownership of drugged horse).[15]

## Conclusion

The plain language of the statute as well as its interpretation by the Coast Guard

12. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled *unless palpably in excess of legislative power.*

Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or *demonstrably irrelevant to the policy the legislature is free to adopt,* and hence an unnecessary and unwarranted interference with individual liberty.

*Nebbia, supra,* at 537–39, 54 S.Ct. at 516 (emphasis added).

13. *See, e. g.,* G. Calabresi, Some Thoughts on Risk Distribution and the Law of Torts, 70 Yale L.J. 499 (1961).

14. *Ward v. Coleman, supra* at 1357.

15. We reject the suggestion in *Atlantic Richfield, supra,* that a due process claim might be made out in some instances of zero fault and third party causation because it ignores the same case's earlier recognition that the civil penalty also serves the non-deterrent purpose of financing the revolving fund. *Compare* 429 F.Supp. at 840 *with* n.14 at 841–42.

permit the assessment of a substantial penalty in the absence of fault. Such a penalty is rationally related to the FWPCA's economic purpose of placing the financial burden of achieving and maintaining clean water on owners or operators of polluting facilities.

The district court's enforcement of the $2,000 civil penalty is Affirmed.

WOOD, Circuit Judge, concurring.

As I believe Judge Castle has correctly analyzed the applicable law I join in his opinion, but as a matter of principle do so with some reluctance.

The company which will have to pay this fine can no doubt do so without any economic pain. I recognize, however, no justification for the basic unfairness it involves. The company is concededly not guilty of the slightest fault. It in no way caused the accident, except it was in business. Just being in the business of supplying critical energy or other needs for our society scarcely justifies this type of penalty being imposed by someone in a government agency. I fail to see how it will deter or remedy anything. The company did not conceal the accident, but actively engaged in efforts to contain the spill. This fine and others as unjustified will only be passed along to the consuming public. Little good can be accomplished in these particular circumstances by this unusual process which is generally considered to be contrary to the accepted principles of law and equity.

BAUER, Circuit Judge, concurring.

I too believe that Judge Castle has correctly decided the matter before us as a matter of law and I concur in his opinion. While I also agree that the responsibilities of this court go no further than such a legal analysis—without contested facts—I am also joining in Judge Wood's concurring remarks. It seems to me that the Coast Guard, having been given such a fantastic amount of leeway by the Congressional action involved, should pay closer attention to the purposes for which the legislation was passed—environmental protection. To pun-ish a business engaged in enterprises essential to our national well-being for an unfortunate accident when the business is faultless, seems to be a self-defeating exercise of power. "Strict liability" concepts normally refer to *compensation,* not punishment without fault.