**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**TEX–TOW, INC., Defendant-Appellant.**

**No. 78–1656.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1978.
Decided Dec. 22, 1978.

Bauer and Harlington Wood, Jr., Circuit Judges, filed a concurring opinion.

Larry D. King, Houston, Tex., for defendant-appellant.

Robert L. Simpkins, Asst. U. S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, and BAUER and WOOD, Circuit Judges.

CASTLE, Senior Circuit Judge.

Tex-Tow, Inc. appeals from the district court's enforcement by way of summary judgment of a $350 civil penalty assessed by the United States Coast Guard against Tex-Tow under section 1321(b)(6) of the Federal Water Pollution Control Act (FWPCA)[1] for a discharge of oil into navigable waters in violation of section 1321(b)(3) of the Act. In this case, as in *United States v. Marathon Pipe Line Company,* 589 F.2d 1305 (7th Cir. 1978), decided this same day, a company was held liable to a civil penalty based on its ownership or operation of a discharging facility even though it was not at fault and the spill was caused by a third party's act or omission. In *Marathon,* the company argued that no more than a nominal penalty could be imposed in the absence

of fault. Here, Tex-Tow argues that no penalty, nominal or substantial, can be imposed on a party that did not "cause" the spill. We sustain the penalty against this new attack for much the same reasons as in *Marathon,* as Tex-Tow's causation argument is very similar to Marathon's fault argument and suffers from the same defect that it ignores the absolute nature of the civil penalty liability, as well as the penalty's remedial and economic rather than deterrent objectives.

Tex-Tow operated a tank barge which was being loaded with a cargo of gasoline at a dock on the Mississippi River owned and operated by Mobil Oil Company. As the barge was filled with gasoline, it sank deeper into the water, settling on an underwater steel piling that was part of the dock structure. The piling punctured the hull of the barge, resulting in a discharge of 1600 gallons of gasoline into the river. Concededly Tex-Tow was not at fault as there is no reasonable way it could have known of the piling and it received no warning from Mobil. We will also assume for purposes of this opinion that Tex-Tow would have a third-party causation defense (on the basis of an act or omission by Mobil), if such a defense were available in the case of the civil penalty.

### The Statutory Scheme

The FWPCA was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Toward that end, Congress set the goal of eliminating the discharge of all pollutants into navigable waters by 1985. § 1251(a)(1). Section 1321, dealing with oil and hazardous substance liability, sets a "no discharge" policy of immediate effect and prohibits any discharge in harmful quantities. §§ 1321(b)(1) and (3). The section holds owners or opera-

---

1. 33 U.S.C. § 1321(b)(6) (1976). All references to the FWPCA in this opinion are to the 1972 and 1973 amended versions. The 1977 amend- ments, which changed the wording of section 1321(b)(6), do not apply to this case as the spill occurred in 1974.

tors of discharging facilities[2] liable for clean-up costs, subject to the defenses of act of God, act of war, negligence of the United States Government, or act or omission of a third party. § 1321(f). If the discharged substance is nonremovable, the owner or operator is liable to a variable civil penalty dependent on the amount and toxicity of the substance spilled.[3] This "liquidated damages liability"[4] is again subject to the four enumerated defenses. § 1321(b)(2)(B) (iii). Finally, section 1321(b)(6), the immediate focus of our concern here, makes owners and operators liable to a civil penalty of up to $5,000, with no provision for any defenses but with the amount of the penalty to be determined by the Coast Guard, which is instructed to take into account ability to pay and "gravity of the violation."[5]

### Statutory Interpretation

First, Tex-Tow argues that the third party causation defense contained in the provisions dealing with clean-up liability and liquidated damages liability should also be read into the civil penalty provision. We decline to do so, as did the court in *United States v. General Motors Corp.,* 403 F.Supp. 1151, 1157 (D.Conn.1975). As stated in *International Telephone and Telegraph Corporation v. General Telephone & Electronics Corporation,* 518 F.2d 913, 917–918 (9th Cir. 1975):

2. The term "discharging facilities" shall be used where the statute refers to "vessel, onshore facility, or offshore facility."

3. The EPA is charged with drawing up a schedule assigning appropriate per unit penalties to various nonremovable substances. § 1321(b) (2)(B)(iv).

4. This penalty, assessed only where clean-up is impossible due to the nonremovable nature of the hazardous substance, has elsewhere been called a "penalty in lieu of clean-up costs." *See, e. g., United States v. General Motors Corp.,* 403 F.Supp. 1151, 1157 (D.Conn.1975).

5. Section 1321(b)(6) states:
Any owner or operator of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of [section 1321(b)(3)] shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is op-

There are two circumstances in which this court may look beyond the express language of a statute in order to give force to Congressional intent: where the statutory language is ambiguous; and where a literal interpretation would thwart the purpose of the over-all statutory scheme or lead to an absurd result. (Citations omitted.)

Neither of these circumstances is present here. The statutory language is not ambiguous, and a literal interpretation according no third party or other defenses to the civil penalty furthers the overall statutory scheme of shifting the cost of pollution onto the polluting enterprise. It is true that the statute affords narrow defenses to the two other liabilities, however absolute liability in the case of the civil penalty is not unduly harsh or unreasonable in view of the limited nature of the liability (maximum of $5,000) and the flexibility afforded by the statutory directive that the Coast Guard, in setting the amount of the penalty, take into account the charged party's ability to pay and the "gravity of the violation," which has been interpreted by the Coast Guard to include degree of culpability.[6]

Tex-Tow, however, asserts that a causation requirement must be implied in the civil penalty provision because no liability may exist in the absence of causation. We agree that causation is required even under a strict liability statute, however

erating of not more than $5,000 for each offense. No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearing on such charge. Each violation is a separate offense. *Any such civil penalty may be compromised by such Secretary.* In determining the amount of the penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered by such Secretary. . . .

6. "Coast Guard Policy for the Application of Civil Penalties under Section 311(b)(6), FWPCA," reprinted as an appendix to *United States v. LeBeouf Bros. Towing Co., Inc.,* 377 F.Supp. 558, 569 (E.D.La.1974).

Tex-Tow has conceded that the presence of its barge at the pier was a cause in fact of the spill. The only question is whether legal, or proximate, cause also exists. This is "essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." Prosser, The Law of Torts 244, § 42 (4th ed. 1971). Tex-Tow argues that the mere presence of its barge at the dock is not sufficient to constitute legal cause. We believe, however, that more than "mere presence" was involved here. Tex-Tow was engaged in the type of enterprise which will inevitably cause pollution and on which Congress has determined to shift the cost of pollution when the additional element of an actual discharge is present. These two elements, actual pollution plus statistically foreseeable pollution attributable to a statutorily defined type of enterprise,[7] together satisfy the requirement of cause in fact and legal cause. Foreseeability both creates legal responsibility and limits it. An enterprise such as Tex-Tow engaged in the transport of oil can foresee that spills will result despite all precautions and that some of these will result from the acts or omissions of third parties. Although a third party may be responsible for the immediate act or omission which "caused" the spill, Tex-Tow was engaged in the activity or enterprise which "caused" the spill. Congress had the power to make certain oil-related activities or enterprises the "cause" of the spill rather than the conduct of a third party.[8] With respect to the civil penalty Congress has exercised this power.

The statistical foreseeability of an accident is a proper basis on which to affix legal responsibility. In *Mickle v. Blackmon,* 252 S.C. 202, 166 S.E.2d 173 (1969) the statistical foreseeability of automobile accidents gave rise to a manufacturer's duty to design cars to minimize injury upon collision. In *Davis v. Wyeth Laboratories, Inc.,* 399 F.2d 121 (9th Cir. 1968), the statistical foreseeability of some adverse reactions to a polio vaccine gave rise to a manufacturer's duty to warn consumers, as marketing the vaccine without the warning was held to constitute a "defect" under strict products liability law. Under the absolute liability standard here involved neither fault nor defect need be proved, so foreseeability is used not to establish these but rather to affix legal responsibility despite the absence of fault or defect and also to limit the scope of that liability.

We note that the question of ultimate liability remains unresolved, as Tex-Tow may still have an indemnity cause of action against Mobil under section 1321(h). However, the only court to consider the question has construed section 1321(h) as not extending the indemnity cause of action to recovery of the civil penalty. *Tug Ocean Prince, Inc. v. United States,* 436 F.Supp. 907, 926 (S.D.N.Y.1977).[9] Such an interpretation is consistent with the economic or risk-shifting view of the civil penalty here taken, as the party engaged in the potentially polluting enterprise is in the best position to estimate the risk of accidental pollution and plan accordingly, as by raising its prices or purchasing insurance.[10] Economically, it makes sense to place the cost of pollution on

7. Namely an "owner or operator of any vessel, onshore facility, or offshore facility" which pollutes navigable waters.

8. In fact, the essence of absolute liability is that *conduct* is irrelevant. "Treating the problems of accident law in terms of activities rather than in terms of careless conduct is the first step toward a rational system of resource allocation." G. Calabresi, The Decision for Accidents: An Approach to Nonfault Allocation of Costs, 78 Harv.L.Rev. 713, 716 (1965).

9. Section 1321(h) provides as follows:
(h) *Rights against third parties who caused or contributed to discharge*

The liabilities established by this section shall in no way affect any rights which (1) the owner or operator of a vessel or of an onshore facility or an offshore facility may have against any third party whose acts may in any way have caused or contributed to such discharge . . . .
*Tug Ocean Prince, supra,* interpreted "liabilities" as not including the civil penalty.

10. In other words, Tex-Tow is the "cheapest cost avoider." G. Calabresi and J. Hirschoff, Toward a Test for Strict Liability in Torts, 81 Yale L.J. 1055, 1060 (1972).

the enterprise (here water transport of gasoline) which statistically will cause pollution and in fact does cause pollution.[11] We do not, however, here decide the question of ultimate liability.

### Substantive Due Process

■ What we have already said respecting Tex-Tow's statutory interpretation argument goes far toward refuting Tex-Tow's second argument that imposing a civil penalty in a situation of third party causation is irrational. First, we note that the Supreme Court has not struck down an economic regulation on the substantive due process grounds here urged since 1937.[12] Second, Tex-Tow's claim of irrationality is grounded in the assumption that the purpose of the civil penalty is to *deter* spills. As we have already explained here and in *Marathon,* the civil penalty also has certain non-deterrent, economic purposes which are rationally served by an absolute liability standard.

There are several indicia in section 1321 itself of purposes other than deterrence: neither clean-up liability nor liquidated damages liability is premised on a finding of fault,[13] and, of course, civil penalty liability is absolute, although tempered by the statutory directive that "gravity of the violation" be considered in setting the amount of the penalty. There is also evidence of a *remedial* purpose to clean up spills once they occur rather than solely a *deterrent* purpose to prevent spills in the first instance. The section provides for government clean-up of disaster spills, § 1321(d), and of other spills which the discharger does not clean up itself, § 1321(c)(1). To fulfill this remedial function, the Council on Environmental Quality [14] is directed to develop a National Contingency Plan, pursuant to which the EPA and the Coast Guard [15] are authorized, *inter alia,* to set up detection systems, purchase removal equipment, and train and maintain a strike force. § 1321(c)(2).

The civil penalty is directly implicated in all these remedial functions as proceeds from civil penalty collections are to be placed in the revolving fund which finances these government activities. § 1321(k). It is reasonable to require those who "cause" damage, not by their conduct but by the activity they are engaged in, to pay for the costs of abating that damage. Forfeitures have been used to finance a regulatory scheme, *see, e. g. One Lot Emerald Cut Stones v. United States,* 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972), and penalties or forfeitures have been sustained against due process attack even though the charged party was faultless and a third party was the immediate cause of the violation. *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (yacht forfeited even though third parties violated the drug laws), *Edelberg v. Illinois Racing Bd.,* 540 F.2d 279 (7th Cir. 1976) (winnings forfeited although third parties drugged the horse).

---

11. This is the theory of cost "internalization," under which the social costs of an enterprise are attributed to that enterprise. The enterprise will presumably pass such costs on to consumers of its product in the form of higher prices. The consumer will then be charged the true cost of the product (cost to the manufacturer plus cost to society), and in making his personal decision as to whether the product is "worth it" also be casting a vote as to the social utility of the product. *See, e. g.,* Calabresi, The Decision for Accidents, note 8 *supra,* at 717–20.

12. G. Gunther, Constitutional Law Cases And Materials 591 (9th ed. 1975). "Economic regulation" is used in contrast to regulation of non-economic personal interests. *Id.* at 565, 567. The civil penalty would clearly be an economic regulation as no personal or non-economic interest of Tex-Tow is involved.

13. The defenses of act of God, act of war, negligence of the United States Government, and act or omission of a third party leave open the possibility that a faultless owner or operator will nevertheless be held liable because of the inapplicability of any of these four narrow defenses.

14. The President delegated his planning authority under § 1321(c)(2) to the Council on Environmental Quality. Executive Order No. 11735, Assignment of Presidential Functions, Sec. 4 (appended to 33 U.S.C. § 1321).

15. *Id.* at Sec. 5(b).

**1316**

The present case is stronger than these forfeiture cases as the activity of the charged owner or operator (water transportation of oil) *is* responsible for the pollution.

 We hold that the "cause" of a spill is the *polluting enterprise* rather than the *conduct* of the charged party or a third party. Accordingly, an owner or operator of a discharging facility is liable to a section 1321(b)(6) civil penalty even where it exercised all due care and a third party's act or omission was the immediate cause of the spill.

Affirmed.

BAUER and WOOD, Circuit Judges, concurring.

We concur, but with the same reservations we expressed in concurring in *United States v. Marathon Pipe Line Company,* 589 F.2d 1305, also decided this date.

Bauer, Circuit Judge, filed a concurring opinion.