**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**WEST OF ENGLAND SHIP OWNER'S MUTUAL PROTECTION & INDEMNITY ASSOCIATION (LUXEMBOURG), Hollywood Marine, Inc., in Personam, as Owner/Operator of the TANK BARGE HOLLYWOOD 2006, et al., Defendants–Appellants.**

No. 87–3787.

United States Court of Appeals,
Fifth Circuit.

May 5, 1989.

John M. Woods, New York City, Gordon A. Grant, Jr., Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, La., for defendants-appellants.

Thomas J. Donlon and David V. Hutchinson, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before THORNBERRY, KING and JONES, Circuit Judges.

KING, Circuit Judge:

The tug Aline B, towing a barge, headed northbound on a navigable stretch of the Atchafalaya River, outside a channel maintained by the Corps of Engineers. The barge struck an unmarked wreck and discharged oil. After the owner of the barge refused responsibility for the discharge, the United States removed the oil and sued the owner under 33 U.S.C. § 1321(f)(1) of the Federal Water Pollution Control Act for the cost of cleanup. The district court held the defendants liable, finding that the tug's non-negligent decision to navigate outside the channel was a contributing cause of the oil discharge and that the defendants had therefore failed to prove that the discharge was caused solely by the act or omission of a third party. We affirm the judgment of the district court, holding that section 1321(f)(1) is causation-based, as opposed to fault-based, and that the district court's finding that the tug's choice of navigation, although non-negligent, was a contributing cause of the discharge was not clearly erroneous.

I.

On March 5, 1985, the M/V Aline B ("Aline B" or the "tug"), towing the T/B Hollywood 2006 ("Hollywood" or the "barge"), departed Morgan City, Louisiana, destined for Krotz Springs, Louisiana. The Hollywood carried a cargo of oil. Allen Boudreaux ("Boudreaux"), the captain of the Aline B, testified that at approximately 4:15 a.m. on the day of departure, the Aline B cleared the locks and that by 5:10 a.m.

the Aline B was heading northbound on the Atchafalaya River (the "river").

Boudreaux stated that the Aline B proceeded upriver beyond Stouts Pass and entered a portion of the river called Six Mile Lake, which is located northwest of Morgan City. Within Six Mile Lake is a channel which the United States Army Corps of Engineers ("Corps of Engineers") maintains.[1] Although dotted lines mark the channel on a map, the parties stipulated that the actual channel in the river is not marked. Jorge Cano ("Cano"), a pilot employed by the Corps of Engineers, testified that in Six Mile Lake, the channel is closer to the left bank than to the right bank and that the water near the right bank is shallower than the water near the left bank. Boudreaux testified that he navigated the Aline B along the right bank to avoid the current and the downbound traffic. Trial testimony established that Boudreaux was navigating the tug outside the channel but within a navigable waterway.

At approximately 6:45 a.m. on March 5, 1985, the Hollywood struck an unmarked wreck, and as a result of this collision, the Hollywood discharged oil into the river. After the collision, the Coast Guard informed Hollywood Marine, Incorporated ("Hollywood Marine"), the owner of the Hollywood, that it was responsible for the cleanup of the oil, pursuant to section 1321 of the Federal Water Polution Control Act ("FWPCA"), 33 U.S.C. § 1321 (1986 and Supp.1988). Hollywood Marine refused to clean up the oil, and the Coast Guard arranged for the removal of the oil at a cost of $89,189.25. Hollywood Marine was then billed for that amount on August 2, 1985. Hollywood Marine, again, denied responsibility. Meanwhile, the Corps of Engineers discovered the unmarked wreck between seventy-five and one hundred fifty feet off the right bank and removed it.

Because of Hollywood Marine's refusal to pay for the oil cleanup, on December 5, 1986, the United States brought suit in federal district court against Hollywood Marine and West of England,[2] which provided proof of financial responsibility for the Hollywood pursuant to 33 U.S.C. § 1321(p) (1986). The United States moved for summary judgment on April 27, 1987, which the district court denied without prejudice to the government's right to reurge the motion after discovery. On September 9, 1987, the United States reurged its summary judgment motion, essentially arguing that section 1321(f)(1) provides for strict liability. The United States argued further that since the barge's or the tug's actions, though non-negligent, contributed to the oil spill, the liability exception under the statute was inapplicable because the act or omission of a third party was not the *sole* cause of the discharge. The district court denied the United States' summary judgment motion, agreeing with the United States' interpretation of the statute but finding that a genuine issue of fact existed as to whether the actions of the barge or the tug contributed to the oil spill.

After the parties stipulated to the source of the oil discharge, the cost of the cleanup, and the lack of negligence on the part of the tug, the barge, and the government,[3] a bench trial was held on October 5, 1987, concerning the issue of causation. At the conclusion of the trial, the district court held that because the decision of where to navigate—namely, outside the channel—was a contributing cause of the oil discharge, the liability exception provided by section 1321(f)(1)(D) was unavailable to the defendants. Therefore, the district court

---

**1.** The Corps of Engineers maintains the channel by taking reconnaissance surveys—soundings of the channel—to discover obstructions in the channel. The Hydrographic Bulletin, which is available to the public, publishes the information from the surveys quarterly.

**2.** Hollywood Marine and West of England are collectively called the defendants.

**3.** The actual stipulation concerning the government's lack of negligence stated that the "existence of the wreck was unknown to ... the government of the United States or any of its agents." The defendants' counsel expounded on this stipulation during the trial and stated: "The government did not have a duty to mark this wreck because prior to the casualty it did not know of the existence of the wreck. That's why that has been stipulated."

held that the defendants were jointly, severally, and *in solido* liable to the United States for the actual cost of the cleanup plus prejudgment interest at a rate of nine percent.[4] The district court entered a final judgment on October 13, 1987, and on October 23, 1987, the defendants filed a timely notice of appeal. On appeal, the defendants argue that the district court erred in holding: (1) that section 1321(f)(1)(D) is causation-based and not fault-based and (2) that because the choice of navigation was a contributing cause of the oil discharge, the liability exception of section 1321(f)(1)(D) does not apply in that the defendants cannot prove that the discharge was caused *solely* by the act or omission of a third party.[5]

## II.

### A. *Fault or Causation?*

■ We first address the defendants' argument that the district court erred in holding that section 1321(f)(1)(D)[6] is causation-based and not fault-based. Given that such a holding is a conclusion of law, we review it de novo. *Byram v. United States*, 705 F.2d 1418, 1421 (5th Cir.1983).

The defendants argue that while the FWPCA is a strict liability statute, section 1321(f)(1)—consisting of four liability exceptions—relieves the discharger of strict liability. We agree that if a defendant can establish the existence of one of the four exceptions, it will be exempt from liability. *See United States v. M/V Big Sam*, 681 F.2d 432, 437 (5th Cir.1982), *cert. denied*, 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983). The defendants argue further that merely proving that the barge and tug were non-negligent[7] satisfies section 1321(f)(1)(D). We disagree with this contention and affirm the district court on this issue for the following reasons.

"[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *accord American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982).[8] The language of section

---

4. In addition to the cleanup cost and the prejudgment interest, the district court assessed the defendants a six percent late payment penalty and a $12.00 per month administrative charge.

5. The district court stated in its oral decision that the United States carried the burden of proving that the oil discharge was not caused solely by an act or omission of a third party, i.e., "that the defendant[s] [were] a contributing cause of the oil spill in question." Given the wording of section 1321(f)(1), *see infra* note 6, however, the defendants, not the United States, carry the burden of proving that one of the four liability exceptions under section 1321(f)(1) exists.

6. 33 U.S.C. § 1321(f)(1) provides in pertinent part:
     **(f) Liability for actual costs of removal** (1) Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any vessel from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of

this section shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil or substance by the United States Government in an amount not to exceed, in the case of an inland oil barge $125 per gross ton of such barge, or $125,000, whichever is greater, and in the case of any other vessel $150 per gross ton of such vessel (or, for a vessel carrying oil or hazardous substances as cargo, $250,000), whichever is greater, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs.

7. The tug's non-negligence is important because the tug does not constitute a third party within the meaning a section 1321(f)(1)(D). *United States v. LeBeouf Bros. Towing Co.*, 621 F.2d 787 (5th Cir.1980), *cert. denied*, 452 U.S. 906, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981).

8. The Supreme Court in *American Tobacco Co.* stated that the plain meaning of the statutory language is particularly compelling where the

1321(f)(1)(D), *see supra* note 6, is couched in causation terms—an owner or operator must prove that the discharge was *caused solely by* the act or omission of a third party in order to escape liability. Moreover, the statute does not state that a showing of non-negligence on the part of the discharger will suffice to invoke the exception and absolve the owner and operator from liability. Congress expressly used the term "negligent" in other parts of section 1321 but did not use such a term in articulating the burden that an owner or operator must carry in order to satisfy the liability exceptions. Instead, Congress used the phrase "caused solely by" with no indication that fault, or the lack thereof, plays a role in establishing a section 1321 liability exception. *See Reliance Ins. Co. v. United States*, 677 F.2d 844, 848 (Ct.Cl. 1982) (proof of non-negligence does not mitigate liability under section 1321(i)(1)(D) because this section incorporates no standard of limited liability—section 1321(i)(1)(D) is the equivalent of section 1321(f)(1)(D) for onshore and offshore facilities). Finally, there is no indication in the legislative history that, contrary to its causation-based statutory language, section 1321 is fault-based.

The defendants argue that Congress expressed a clear intent that section 1321 be fault-based in the following statement in the Senate Committee Report:

> The committee determined that while the owner or operator should not be liable if he could prove that a discharge was caused by one of these acts [the four liability exceptions in section 1321], it was also necessary that such exceptions be allowed only when the owner or operator proved the discharge to be solely the result of one of the exceptions. *Any culpability on the part of the owner or operator would vitiate the exception.*

Senate Comm. on Public Works, Federal Water Pollution Control Act [hereinafter the Senate Comm. Report], S.Rep. No. 351, 91st Cong., 1st Sess. 6 (1969) (emphasis added), *reprinted in* III EPA Compilation of Legal Authority [hereinafter EPA Compilation], Legislative History of the Federal Water Pollution Control Act at 1329 (1973). Although, in theory, we look to the legislative history only if the statutory language is unclear, *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984), in fact, the legislative history is often consulted where the language of the statute *is* clear (as it is here) for what might be called "further assurances."

In evaluating the quoted language from the Senate Committee Report, we note that the final sentence does state that if an owner or operator is at fault, then it may not successfully claim a liability exception. The language does *not* state, or even imply, the reverse: that an owner or operator establishes the existence of a section 1321 exception, absolving itself from liability, once it proves that it was non-negligent. Moreover, in the preceding sentence, the Committee used causation language in explaining section 1321(f)(1) by stating that the exceptions will be allowed only when the discharge is *solely the result of* one of the exceptions.

Other language in the FWPCA's legislative history reinforces our conclusion that an owner's or operator's proof of non-negligence alone does not satisfy the section 1321 liability exceptions. As we recognized in *United States v. Dixie Carriers, Inc.*, 627 F.2d 736, 739 (5th Cir.1980), the FWPCA represents a compromise between two proposed statutes, the House bill and the Senate bill. The proposed House bill prohibited the discharge of oil in navigable waters but imposed civil penalties and cleanup liability only on an owner or operator who willfully or negligently discharged the oil. The House bill also provided for a reverse burden of proof—the discharge established a prima facie case of liability

---

circumstances of the drafting demonstrate that Congress gave special attention to the language selected. 456 U.S. at 68–69, 102 S.Ct. at 1537–38. Representative Harsha showed that such was the case with the FWPCA by stating: "The position of the conferees on each subject indeed on each sentence and on every word was carefully considered in the light of the evidence that we had before us." 116 Cong.Rec. 9328, *reprinted in* IV EPA Compilation of Legal Authority, Legislative History of the Federal Water Pollution Control Act at 1984 (1973).

against the owner or operator which it could rebut. Apparently, it could rebut the prima facie case by showing that his actions were not willful or negligent. House Comm. on Public Works, Federal Water Pollution Control Act, H.R.Rep. No. 127, 91st Cong., 1st Sess. 10–11 (1969), *reprinted in* III EPA Compilation at 1258–60 (1973). The Conference Committee, H.R. Rep. No. 940, 91st Cong., 2d Sess. 5 (1970), *reprinted in* III EPA Compilation 1475–76 (1973), however, rejected the negligence approach with the reverse burden of proof and adopted the Senate bill approach of strict liability with limitations. *See* Senate Comm. Report, S.Rep. No. 351, 91st Cong., 1st Sess. (1969).

The Senate Committee Report, discussing the decision, stated:

The committee determined ... that some form of absolute liability should be imposed....

... [Marine] [i]nsurance ... has been designed to protect people who either work for, use, own or operate a vessel. Were this the case with oil pollution, the imposition of liability based on negligence would not be questioned. However, the discharge of oil can and usually does affect the general public, and persons and property wholly unrelated to the vessel, who have no control over it, and who have no interest in it.

The public interest, it can be argued, can be completely protected only by absolute and unlimited liability; negligent and limited liability should protect only private interests....

Under absolute liability with limits, a vessel owner would be absolutely liable regardless of fault, but the injured party would be limited in the amount of the damages which could be collected. This approach *avoids the difficult, if not impossible, task* of proving negligence or *rebutting the case for non-negligence* made by the vessel owner. It also places the risk on the responsible party, not on the general public.

*Id.* at 5 (emphasis added).

The Senate Committee Report then discussed the limitations of the liability, stating the four liability exceptions that section 1321(f)(1) lists. The Senate's approach of strict liability with limitations, as opposed to the House's approach of negligence liability with a reverse burden of proof, was the one ultimately enacted.

Given its statutory language and legislative history, it is clear that section 1321(f)(1) is causation-based and not fault-based. Therefore, we reject the defendants' argument that proof of non-negligence alone is enough to satisfy section 1321(f)(1)(D) and exonerate them from liability.

### B. *Sole Cause*

■ The defendants next argue that even if section 1321(f)(1)(D) is causation-based and not fault-based, the oil discharge was caused solely by an act or omission of a third party.[9] The defendants assert that the district court erred in holding that the choice of navigation was a contributing cause[10] of the oil discharge and that, therefore, the defendants were liable.

Causation is generally a question of fact, *Employers Ins. v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 768 (5th Cir. 1989); *Southern Nat'l Bank v. Crateo, Inc.*, 458 F.2d 688, 697 (5th Cir.1972), and a

**9.** The act or omission of a third party which the defendants assert caused the oil spill was that the owner or operator: (1) caused the wrecked barge to sink, (2) failed to mark the wrecked barge, or (3) failed to raise the wrecked barge. We note in passing that the record is virtually devoid of information about the circumstances of the sinking of the wrecked barge and the failure to mark it.

**10.** In its oral ruling at the conclusion of the trial, the district court used the term "contributing cause" to refer to the tug's decision to navigate outside the channel. We recognize that there is a distinction between *the* proximate cause of an event and a contributing or *a* proximate cause of an event. *A* proximate cause imposes a lesser burden of proof, and the defendant's acts do not have to be the dominant factor which caused the injury. Throughout the remainder of the opinion, the term proximate cause or contributing cause will refer to *a* proximate cause or a contributing cause, unless otherwise indicated.

finding of fact will not be disturbed on appeal unless it is clearly erroneous. *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

> [A] finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.... If the district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse even though convinced that had [we] been sitting as the trier of fact, [we] would have weighted the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.... When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings.

*Id.* at 573–75, 105 S.Ct. at 1511–12. For the reasons set forth below, we find no clear error in the district court's finding of fact that the decision to navigate outside the channel was a contributing cause of the oil discharge. We recognize, however, that the challenge levelled by the defendants to the district court's finding may also be viewed as a challenge to the legal sufficiency of the decision to navigate outside the channel as a "cause" of the discharge and to the resulting denial of the exception to liability provided by section 1321(f)(1)(D). As such, we will also review it as a question of law, de novo, and we hold that the navigation decision was a "cause" of the discharge within the meaning of section 1321(f)(1)(D).

■ Liability exceptions under section 1321(f)(1) must be narrowly construed to effectuate Congress' strict liability scheme. *LeBeouf,* 621 F.2d at 789; *Burgess v. M/V Tamano,* 564 F.2d 964, 982 (1st Cir.1977), *cert. denied,* 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978); 115 Cong.Rec. 28957, *reprinted in* IV EPA Compilation at 1771 (1973) (Senator Boggs stated, "[S]uch exemptions have the effect of protecting the public in nearly every case, while safeguarding private interests *at rare times* of great disaster") (emphasis added). As we previously stated, for a discharger to avoid liability, the act or omission of a third party must be the *sole cause* of the discharge. The FWPCA, however, does not define the terms "solely" and "caused." As for the term "solely," we will assume its common definition: "without an associate: singly, alone." Webster's Third New International Dictionary 2168 (1976); *see City of Pawtucket v. United States,* 211 Ct.Cl. 324, 546 F.2d 430 (1976) (assuming the common definition of "solely" contained in section 1321(i)(1)). If the tug's choice of navigation was a proximate cause of the oil spill, then it necessarily follows that the act or omission of a third party was not the *sole* cause. *See Seaboard Air Line R. Co. v. Deese,* 185 F.2d 290, 291 (5th Cir.1950). Concerning the term "caused," we turn to legislative history, tort law,[11] and cases which have previously interpreted causation under section 1321.

It is axiomatic that cause in fact is essential to liability. W. Prosser & P. Keeton, Prosser and Keeton on Torts § 41 (5th ed. 1984) [hereinafter Prosser & Keeton]. Under the infamous "but for" test, the tug's decision to navigate outside the maintained channel is a cause in fact of the oil spill. "[A]lthough causation [cause in fact] is essential to liability, it does not determine it." *Id.* More than "but for" causation is necessary for the defendants to be liable.[12]

---

11. In this context, we are using tort law principles "not to establish [fault] but rather to affix legal responsibility despite the absence of fault ... and also to limit the scope of that liability." *United States v. Tex-Tow, Inc.,* 589 F.2d 1310, 1314 (7th Cir.1978) (stating that foreseeability was being used to affix legal responsibility despite an absence of fault).

12. This statement is supported by the legislative history. The Senate Committee Report gave a hypothetical example of a discharge which would be caused solely by an act of a third party. "Among such acts would be a discharge caused when a vessel collided with another vessel which was secured to a dock." Senate Comm.Report, S.Rep. No. 351, 91st Cong., 1st Sess. 6 (1969), *reprinted in* III EPA Compilation 1329 (1973). If only a "but for" causation was

The question whether the tug's decision to navigate outside the channel was a proximate or contributing cause of the discharge is essentially a question of "whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." *Id.* at § 42. In determining proximate cause, the trier of fact must decide whether the oil discharge was, at least to some degree, *see infra,* foreseeable,[13] given Boudreaux's decision to navigate outside the channel. *United States v. Tex–Tow, Inc.,* 589 F.2d 1310, 1314 (7th Cir.1978). If the oil discharge was thus foreseeable, then Boudreaux's choice of navigation was a proximate cause of the discharge, and the act or omission of a third party cannot be the *sole* cause of the discharge.

In *Tex–Tow,* the Seventh Circuit held a discharger liable for civil penalties under section 1321(b)(6) (1986). Although section 1321(b)(6) does not include a third party defense, we find *Tex–Tow* helpful in ascertaining the boundaries of proximate cause. In *Tex–Tow,* an oil barge was being loaded with gasoline, and as it was loaded, it sank deeper into the water and punctured its hull on an underwater steel piling that was part of the dock structure. The Seventh Circuit recognized that neither the owner nor the operator was negligent even though the presence of the barge was the cause in fact of the spill. Furthermore, the court stated that the mere presence of the barge was not enough to satisfy proximate

cause. Nevertheless, the court held that the defendant's actions were the proximate cause of the spill because actual pollution occurred and the possibility of such pollution as a result of the heavy loading of the barge was foreseeable. *Tex–Tow,* 589 F.2d at 1312–14.

As in *Tex–Tow,* the oil discharge in the present case was sufficiently foreseeable to result in liability under section 1321(f)(1), even if not sufficiently foreseeable to result in liability for negligence. Cano, whose testimony the district court found to be "quite credible,"[14] testified that the water where the Corps of Engineers found the wreck was much shallower than the water in the channel. Further, Cano stated that obstructions are common in the general area of the river where the wreck was found. Cano stated: "About a mile downstream of where this wreck was they have several fishing boats, large size fishing boats, just abandoned, scattered all over.... Fishermen generally put nets, big hook nets, along the bank as they catch their fish." More important to the foreseeability inquiry than the actual condition of the river outside the channel was the risk inherent in choosing to navigate outside the channel which the Corps of Engineers maintains by conducting soundings to locate obstructions and making that information available to the public. In making that decision, Boudreaux clearly increased the risk that the tug and tow would encounter

required under section 1321(f)(1)(D), then the hypothetical example would be rendered nugatory because the decision to secure the vessel to the particular dock would be a "but for" cause.

**13.** The legislative history indicates that an owner or operator will be exempt from liability under section 1321(f)(1) when the discharge is beyond his control. Senate Comm.Report, S.Rep. No. 351, 91st Cong., 1st Sess. 5–6 (1969), *reprinted in* III EPA Compilation 1328–29 (1973). Although the Senate Report used the phrases "no control" and "beyond the control of" to refer specifically to an act of war and an act of God, the phrases give some guidance to the word "caused" and to the exceptions as a whole. The Senate Report further defined "beyond the control of," when referring to an act of God, by stating "[a]nother area which the committee believed to be beyond the control of an owner or operator would be any discharge

caused solely by an act of God about which the owner could have no foreknowledge, could make no plans to avoid, or could not predict." *Id.* at 6. This language—"no foreknowledge," "make no plans to avoid," and "could not predict"—supports the use of foreseeability as a means of setting the parameters of the term "caused" as used in section 1321(f)(1).

**14.** In its oral opinion, the district court stated: "I found Mr. Cano's testimony to be extremely helpful and quite credible on the question of channel markings, ability to remain in the channel, and where this wreck was located, namely outside of the channel in his view. I can't—the documents of the Coast Guard are obviously entitled to some deference, but they are not subject to cross-examination, as was Mr. Cano, and I believe that Mr. Cano's testimony was certainly quite credible and believable."

unmarked hazards. The possibility of a collision resulting in an oil discharge in that portion of the river was sufficiently foreseeable to give rise to liability under the statute, and after reviewing the entirety of the evidence, we are not left with the definite and firm conviction that the district court made a mistake in finding that Boudreaux's choice of navigation, though non-negligent, was a proximate or contributing cause of the oil discharge.[15]

The defendants argue, however, that such a holding is tantamount to holding that a vessel underway will always be liable because its choice to navigate will always be a contributing cause. We cannot agree. The government concedes and we recognize that underway status alone is not an automatic proximate or contributing cause to an oil spill. Merely choosing to navigate, however, is not the only factor involved in the present case. The choice made was not simply a choice to navigate, but it was a choice to navigate outside a maintained, marked channel. The non-negligence of such a choice does not insulate the choice from being a proximate or contributing cause under the statute.

The defendants finally argue that an act or omission of the owner or operator of the unmarked wreck was *the* proximate cause of the oil spill, and they define the proximate cause as "the dominant and efficient cause of the loss and not a merely incidental cause which may be nearer in time to the casualty." The defendants in effect urge that we equate "the proximate cause" with "the sole cause," but the defendants point to nothing in either the statute or the legislative history to support the proposition that Congress intended to equate the term "the sole cause" or "caused solely by" with the term "the proximate cause." Indeed, our reading of the statute and the legislative history suggests that when there are multiple causes of a discharge and one cause is the dominant or proximate cause, to view that dominant or proximate cause as being the sole cause of the discharge would not be faithful to Congressional intent. *See also Southern Nat'l Bank*, 458 F.2d at 697 (the terms proximate cause and sole cause do not have the same legal meaning); *Phoenix Indem. Co. v. Givens*, 263 F.2d 858, 861 (5th Cir.1959) (same).

Congress' strong concern for the nation's water resources is apparent in the language[16] and the legislative history of the FWPCA. *See* Senate Comm. Report, S.Rep. No. 351, 91st Cong., 1st Sess. 2–3 (1969), *reprinted in* III EPA Compilation at 1325–26 (1973). The legislative history of section 1321 clearly shows that Congress desired a comprehensive solution to the nation's oil spill problem. *Id.* at 4, 7, *reprinted in* III EPA Compilation at 1326, 1330 (1973). Congress was concerned not only with negligent and careless oil discharges but also with accidental oil discharges. *Id.* at 7, *reprinted in* III EPA Compilation at 1330 (1973). After much consideration, Congress endorsed an absolute liability system with limited exceptions, which are to be narrowly construed. In the view of Congress, such a system best protected the public and placed the risk on the responsible party, not on the general public. *Id.* at 5, *reprinted in* III EPA Compilation at 1328 (1973). Our decision is in harmony with Congressional intent, and we hold that the district court did not err as a matter of fact or law.

### III.

For the foregoing reasons, we hold that section 1321(f)(1) is causation-based and that simply proving non-negligence on the part of a discharger will not satisfy the liability exceptions listed in section

---

15. We are not here presented with, and we do not address, a situation in which a discharge is a direct but unforeseeable consequence of the defendants' conduct, *see* Prosser & Keeton, *supra*, at § 42, which was apparently the situation presented to the Court of Claims in *Reliance Ins. Co. v. United States*, 230 Ct.Cl. 390, 677 F.2d 844 (1982).

16. Congressional policy is set forth directly in section 1321(b)(1) which provides: "The Congress hereby declares that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States...." 33 U.S.C. § 1321(b)(1) (1986).

1321(f)(1). Furthermore, we hold that the district court's finding that the choice of navigation was a proximate or contributing cause of the oil discharge was neither an error of fact nor law. We therefore AFFIRM the district court.